# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | | |
|---|---|---|
| THE ESTATE OF WILLIAM ZACKARY | * | |
| HARVEY, SHIRLEY FRANCIS, as | * | |
| Mother of William Zackary Harvey, and | * | |
| Michael Harvey, as surviving son of | * | |
| William Zackary Harvey, | * | |
| | * | |
| Plaintiffs, | * | Civil Action No.: 4:23-cv-00064 |
| | | |
| v. | * | **Jury Trial Demanded** |
| | | |
| Former POLICE CHIEF ROY W. | * | |
| MINTER, in his individual capacity, | * | |
| CITY OF SAVANNAH, GEORGIA, | * | |
| a Municipal Corporation of | * | |
| the State of Georgia, SILVER | * | |
| LEUSCHNER, individually, MICHAEL | * | |
| KERR, individually, and MATTHEW | * | |
| WHITE, individually, | * | |
| | | |
| Defendants. | | |

## SECOND AMENDED COMPLAINT FOR DAMAGES

William Zackary Harvey committed suicide in the City of Savannah Police
Headquarters after warning that he would do so and after demonstrably indicating
his intention to engage in serious self-harm. This lawsuit is filed on behalf of William
Harvey's estate, under 42 U.S.C. § 1983, the Americans with Disabilities Act, the
Rehabilitation Act, and Georgia law. This Second Amended Complaint for Damages
amends Counts II and III, only of the First Amended Complaint.

1

<u>PARTIES</u>

1. Plaintiff Shirley Francis is the natural mother of William Zackary Harvey ("Ms. Francis"). Ms. Francis is a resident of the State of Georgia and over the age of eighteen.

2. The Estate of William Zackary Harvey was established by order of the Probate Court of Chatham County on February 28, 2023, with Ms. Shirley Francis being appointed as administrator of the Estate. The Estate sues to recover damages for pain and suffering which occurred prior to Mr. Harvey's death, along with funeral and burial expenses.

3. Mr. William Zackary Harvey was not married at the time of his death, but was survived by two adult children, to wit: Michael Harvey and Akeem Davis.

4. Michael Harvey is one of the surviving children of Mr. William Zackary Harvey and is bringing the wrongful death aspect of this claim for the benefit of himself and his surviving sibling, Akeem Davis.

5. Defendant Roy W. Minter was at all times pertinent to this lawsuit the duly appointed Chief of Police of the City of Savannah, Georgia.[1]  When served in

---

[1] As of the time of the filing of this lawsuit, Roy Minter is no longer the City of Savannah's Chief of Police. That position is now held by Chief Lenny Gunther.

the manner prescribed by law Defendant Minter shall be subject to the jurisdiction of this Court.

6. Defendant City of Savannah is a municipal subdivision of the State of Georgia. When served in the manner prescribed by law, Defendant City of Savannah shall be subject to the jurisdiction of this Court.

7. Upon information and belief, Defendant City of Savannah, through its Police Department, was at all relevant times herein responsible for the hiring, retention, training, and supervision of the involved officers, employees, and/or contractors.

8. Upon information and belief, Defendant City of Savannah was at all relevant times herein responsible for the customs and practices of its Police Department.

9. Defendant Silver Leuschner was, at all relevant times herein, a City of Savannah police officer assigned to oversee Mr. Harvey on the date of his death and acted under color of law. When served in the manner prescribed by law Defendant Leuschner shall be subject to the jurisdiction of this Court.

10. Defendant Matthew White was, at all relevant times herein, a City of Savannah police officer assigned to oversee Mr. Harvey on the date of his

death and acted under color of law. When served in the manner prescribed by law Defendant White shall be subject to the jurisdiction of this Court.

11. Defendant Sgt. Michael Kerr was formerly employed with the City of Savannah's Police Department. When served in the manner prescribed by law Defendant Kerr shall be subject to the jurisdiction of this Court.

<u>JURISDICTION AND VENUE</u>

12. This action arises under the authority vested in this Court by virtue of 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

13. This Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

14. Upon service of process of the Summons and Complaint, this Court acquires jurisdiction of the Defendants under Fed. R. Civ. P. 4(k)(1)(a).

15. Venue is proper in the Savannah Division of the Southern District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this District.

16. Additionally, at least one of the Defendants is a citizen of the territorial area within the Southern District of Georgia.

## **FACTS GIVING RISE TO THE PLAINTIFFS' CLAIMS**

### The April 2, 2021 Arrest of Mr. William Harvey

17.  On April 2, 2021, Defendant Matthew White ("White") was employed as an officer by the City of Savannah's Police Department.

18.  On April 2, 2021, Rodheem Greene ("Greene") was employed as an officer by the City of Savannah's Police Department.

19.  On April 2, 2021, Detective Silver Leuschner ("Leuschner") was employed as a detective by the City of Savannah's Police Department.

20.  On April 2, 2021, Timothy Valmont ("Valmont") was employed as an officer by the City of Savannah's Police Department.

21.  On April 2, 2021, White, Greene, Leuschner, and Valmont were dispatched to 2016 Skidaway Road (Pump-N-Go) in connection with a reported altercation between two males.

22.  The altercation involved an intoxicated victim being cut on the hand with a knife.

23.  The alleged victim informed the officers at the scene that he had fallen into a knife while trying to break up a fight between two other males.

24.  Following a brief on-scene investigation, Officer Greene handcuffed the alleged knife-wielding male.

25.  Officer Greene placed the handcuffed male in White's patrol car.

26.  Defendant Leuschner directed Greene to escort the arrested male to the Savannah Police Department's Headquarters.

27.  Greene complied with Leuschner's directive.

28.  The arrested male was taken to the interview room for further questioning.

29.  The interview room is on the third floor of the Savannah Police Department Headquarters.

30.  Once at the Police Department Headquarters the handcuffed male was detained in its interview room.

<u>The Interview</u>

31.  Defendant Leuschner's interview with the handcuffed suspect was conducted in the interview room of the headquarters of the City of Savannah's Police Department.

32.  While walking with the handcuffed male and a patrol officer, Det. Leuschner activated her body worn camera.

33.  Defendant Leuschner did not turn on the camera in the interview room.

34.  Defendant Leuschner explained that she did not turn on the camera in the interview room because she had her body worn camera activated.

## The Handcuffed Suspect's Comments during the Interview

35. Defendant Leuschner described the handcuffed suspect as mumbling and emotional during the interview.

36. The suspect stated that he had stabbed the intoxicated male in self-defense.

37. The suspect described himself as a paranoid schizophrenic.

38. The suspect also described himself as having anxiety.

39. The suspect described himself as "really depressed."

40. The suspect advised Defendant Leuschner that he takes Zoloft for depression.

41. The suspect was reportedly crying during the interview.

42. The suspect stated that he would rather die than go to Jail.

43. The suspect stated that police would have to kill him before he would go back to Jail.

44. The suspect stated, "I'm not a violent person but I'll stand on myself and kill myself."

45. The suspect told Defendant Leuschner that she could not understand how "hurtful" his pending arrest was to him.

46. The suspect told Defendant Leuschner that he had not been in trouble in two- and one-half years.

47. The suspect expressed concern that his mother would be upset by his pending arrest.

48. The suspect expressed concern that his parole officer would be upset by his pending arrest.

49. According to Defendant Leuschner, the suspect yelled unintelligibly.

50. The suspect was reportedly very upset.

51. White described the suspect, while in the interview room, as being loud and emotional.

52. White heard the suspect say, while in the interview room, "I can't go back to Jail."

53. White heard the suspect say, while still at the gas station, "I can't go back to Jail."

54. Defendant Leuschner personally observed the suspect forcefully bang his head on the table in the interview room.

### Defendant Leuschner Exits the Interview Room the First Time

55. Based on her review of the gas station video and the suspect's account of what occurred, Defendant Leuschner believed that the suspect's claim of self-defense was likely plausible.

56. Defendant Leuschner then left the interview room to go speak with her Sergeant about the interview with the suspect.

57. Before leaving the interview room, Defendant Leuschner advised the suspect that she would return.

58. Upon leaving the interview room, Defendant Leuschner turned off her body worn camera.

59. A short time later, Defendant Leuschner returned to the interview room.

<u>Defendant Leuschner Exits the Interview Room the Second Time</u>

60. Upon returning to the interview room, Defendant Leuschner watched Greene handcuff the suspect's left hand to a wall anchor.

61. Greene allowed the suspect's right hand to remain unshackled, for the ostensible purpose of allowing the suspect to sign a waiver of rights form.

62. The suspect is right-hand dominant.

63. Defendant Leuschner then told the suspect to breathe.

64. The suspect then slouched in his chair, with his hand on his face.

65. Defendant Leuschner then exited the interview room a second time.

66. Upon leaving the interview room a second time, Defendant Leuschner told the two patrol officers outside the interview room (one of whom was Greene) to watch the suspect.

67. Specifically, Defendant Leuschner told Greene and White in reference to the suspect: "If you hear something, check on him."

The Prolonged Quiet Causes the Officers to Enter the Interview Room

68. According to Greene, less than thirty (30) minutes after Det. Leuschner's second departure from the interview room, White and Greene entered the room to check on the suspect, because the suspect had been so quiet.

69. According to White, approximately 20-40 minutes expired after Det. Leuschner's second departure from the interview room, before he and Greene went inside to check on the suspect.

The Suicide

70. When White and Greene opened the door to the interview room, they observed one end of a shoestring around the suspect's neck.

71. White and Greene observed that the other end of the shoestring was tied to a whiteboard.

72. The top of the whiteboard was six (6) feet three (3) inches from the floor.

73. The bottom of the whiteboard was three (3) feet, three (3) inches from the floor.

74. The whiteboard had a brown in color metal anchor point, used for securing handcuffs.

75. The handcuff anchor was one (1) foot, ten (10) inches from the floor.

76. The suspect "was tipped over and unconscious," without a pulse.

77. White observed that the suspect appeared to be in a squatting position, just above the seat level with his back against the wall.

78. White observed that the suspect's head was turned to one side.

79. White observed that the suspect's tongue was hanging out.

80. White then began performing CPR on the suspect.

81. Greene then called for EMS and a Sergeant.

82. Another officer assisted EMS in administering chest compressions to the suspect.

83. EMS applied a cardiac monitor to the suspect, but it showed no heart rhythm.

84. The deceased suspect was William Zackary Harvey, age 60.

Audio Recording Not Turned On

85. After finding Mr. Harvey's lifeless body, it was determined that the audio in the interview room had not been turned on while Mr. Harvey was in the interview room.

86. After finding Mr. Harvey's lifeless body, it was determined that the camera system in the interview room had not been turned on while Mr. Harvey was in the interview room.

87. While efforts to resuscitate Mr. Harvey were ongoing, a pair of stainless-steel handcuffs was still affixed to the handcuff anchor in the interview room.

### The Georgia Bureau of Investigation ("GBI") Called in to Assist With Investigation of the In-Custody Suicide

88. On April 3, 2021, at approximately 2:00 a.m., the City of Savannah's Police Department requested the assistance of the Georgia Bureau of Investigation in connection with the in-custody suicide of Mr. William Harvey.

### The GBI is Briefed on the Suicide

89. Shortly after 2:00 a.m., on April 3, 2021, the GBI received a telephone briefing about the in-custody suicide from a Major with the City of Savannah's Police Department.

90. The Savannah Police Department "locked down" the building and did not allow anyone involved with Mr. Harvey to leave.

91. No video or audio recording resumed until after Mr. Harvey's body was discovered.

### The Autopsy of William Harvey's Body

92. The autopsy of William Harvey's body was performed on April 5, 2021, by the Georgia Bureau of Investigation's Division of Forensic Sciences.

93.   The autopsy examination showed that the sixty (60) year old Mr. Harvey was five (5) feet, four (4) inches in height and weighed one hundred twenty-three (123) pounds.

94.   The autopsy report concluded that William Harvey's cause of death was hanging.

95.   The autopsy report concluded that the manner of William Harvey's death was suicide.

96.   According to the autopsy report, Mr. Harvey presented with a white shoestring around his neck.

97.   A ligature mark with abrasion, 0.2 inches wide, completely encircled Mr. Harvey's neck.

Toxicology Examination

98.   The toxicology examination of Mr. Harvey's femoral blood showed that he had ethyl alcohol in his system in the amount of 0.107 grams per 100 mL.

99.   Generally, a level of 0.10 – 0.12 grams per 100 mL results in an obvious physical impairment and loss of judgment.

100.  The toxicology examination of Mr. Harvey's femoral blood showed that it was positive for cocaine, but at a level "lower than the lowest calibration of 50 micrograms/liter."

101. Mr. Harvey's femoral blood was also positive for cocethylene (44 micrograms/liter).

102. Cocethylene is formed by the liver when cocaine and ethyl alcohol coexist in the blood.

103. Mr. Harvey's femoral blood was positive for benzoylecgonine (0.90 mg/L).

104. Benzyoylecgonine is the main metabolite of cocaine.

105. Finally, Mr. Harvey's femoral blood was positive for sertraline.

106. Sertraline is an anti-depressant sold under the brand name Zoloft, among others.

### Notice of Strong Likelihood of Serious Self-Harm

107. As enumerated above, Mr. Harvey made numerous statements to Defendant Leuschner, some of which were heard by White, that showed a strong likelihood that Mr. Harvey might engage in serious self-harm, including suicide.

108. As enumerated above, Mr. Harvey engaged in acts of serious self-harm in Defendant Leuschner's presence that showed a strong likelihood that he might engage in serious self-harm, including suicide.

109. Notwithstanding these acts of self-harm and foreboding statements by Mr. Harvey, including references to the various mental health conditions from

which he suffered, Defendant Leuschner dismissed them, stating to Mr. Harvey in response – "Okay, but do any of those medical conditions keep you from talking to me."

110. Every reasonable law enforcement officer would have been put on notice by the various statements that Mr. Harvey made of the strong likelihood that he might engage in serious self-harm, including suicide.

111. Every reasonable law enforcement officer would have been put on notice by Mr. Harvey's actions involving self-harm committed in Defendant Leuschner's presence of the strong likelihood that he might engage in serious self-harm, including suicide.

112. Defendant Leuschner instructed White and Greene to check on Mr. Harvey because she was aware, based on statements that he made to her of the strong likelihood that he might engage in acts of serious self-harm, including suicide.

113. Defendant Leuschner instructed White and Greene to check on Mr. Harvey because she was aware, based on acts of self-harm Harvey undertook in her presence of the strong likelihood that he might engage in acts of serious self-harm, including suicide.

<u>Mayor Van Johnson Promised Accountability for Mr. Harvey's Death</u>

114. According to published reports, Savannah Mayor Van Johnson condemned the incident of Harvey's untimely death, stating, "I promised the family that we would thoroughly investigate it internally and determine whether rules were broken or not followed, and we would have accountability."

<u>Defendant Minter's June 15, 2021 Press Conference</u>

115. Defendant Chief Minter participated in a June 15, 2021 press conference discussing the death of William Harvey.

116. Defendant Chief Minter said during the June 15, 2021 press conference:  "I don't think any of these officers had any malicious intent in what they did. But they made some poor decisions. They didn't follow department policy and procedure. Of course, poor decisions have consequences and in this particular situation, it had severe consequences."

117. Defendant Chief Minter further stated during the June 15, 2021 press conference that the issue with Mr. Harvey's death was not the absence of having policies in place, but the failure to follow existing policies.

118. Also, in the June 15, 2021 press conference Defendant Chief Minter stated that the City of Savannah's Police Department had already taken initial steps to ensure policies will be followed in the future by members of the department

at all levels "from the chief all the way down to the corporal, sergeant positions."

119. Finally, Defendant Chief Minter added during the June 15, 2021 press conference that in his 35 years in law enforcement, he had not experienced an in-custody death where someone was left unmonitored in an interview room.

<u>Two Separate City of Savannah Investigations Conducted</u>

120. Two separate City of Savannah investigations were conducted as a result of Mr. Harvey's death.

121. The first investigation was conducted by the City of Savannah's Police Department and examined the circumstances of Mr. Harvey's death and sought to ascertain whether there had been any violations of policy or law by the City of Savannah's police officers that caused or contributed to the death of Mr. William Zackary Harvey.

122. The second investigation was conducted by the City of Savannah's Police Department and looked at the circumstances under which a GIF/meme depicting a Black man hanging himself was circulated through the City of Savannah's Police Department following Mr. Harvey's death ("the hanging GIF/meme").

17

<u>The First Investigation</u>

123. The first investigation, examining the circumstances of Mr. Harvey's death, resulted in disciplinary action against three members of the City of Savannah's Police Department – Defendant Silver Leuschner (terminated from employment); Defendant Michael Kerr (terminated from employment); and Defendant Officer Matthew White (suspended from employment).

<u>Cpl. Silver Leuschner</u>

124. Defendant Silver Leuschner was formerly a corporal with the City of Savannah's Police Department.

125. Defendant Leuschner was fired by the City of Savannah's Police Department in response to the death of William Harvey.

126. Defendant Leuschner was terminated by a disciplinary review board.

127. Defendant Leuschner was terminated by a disciplinary review board for violating: a) criminal investigation policy; b) employee responsibility; c) oath of office ethics and conduct; and d) video/audio recording equipment.

128. Defendant Leuschner appealed her termination from the City of Savannah's Police Department.

129. Defendant Leuschner's termination was upheld.

## Sgt. Michael Kerr

130. Defendant Michael Kerr was formerly a Sergeant with the City of Savannah's Police Department.

131. Defendant Michael Kerr was fired by the City of Savannah's Police Department.

132. Defendant Michael Kerr was fired by the City of Savannah's Police Department in response to the death of William Harvey.

133. Defendant Kerr was terminated by a disciplinary review board.

134. Defendant Leuschner was terminated by a disciplinary review board for violating supervisory responsibility.

135. Defendant Kerr appealed his termination from the City of Savannah's Police Department.

136. Defendant Kerr's termination was upheld.

## Officer Matthew White

137. At all times relevant herein, Defendant Matthew White was an officer with the City of Savannah's Police Department.

138. Defendant Matthew White was suspended by the City of Savannah's Police Department.

139. Defendant White was suspended by the City of Savannah's Police Department in response to the death of William Harvey.

140. Defendant White was suspended by a disciplinary review board.

141. Defendant White was suspended by a disciplinary review board for violating: a) employee responsibility; and b) oath of office ethics and conduct.

<u>The Second Investigation</u>

142. The persons involved in the second investigation are not named as Defendants in this lawsuit, but their actions are illustrative of the racial animus against Black people of apparently modest means that rose to the level of policy or practice or that motivated the mistreatment of Mr. Harvey on April 2, 2021.

143. The second investigation was triggered as a result of a GIF or meme circulated by David Curtis ("Curtis") on the group chat for the police watch for which Curtis worked.

144. Members of the group chat included but were not limited to: Christopher Hewett ("Hewett"); Erica Tremblay ("Tremblay"), and David Curtis.

145. The GIF or meme featured a Black man with a rope around his neck, who performed a gymnastic move, while flipping, then hanging himself. The caption that Curtis wrote, asked, "Is this too early to send this to Greene?"

146. Like Mr. Harvey, and the man depicted in the GIF/mem, Greene is Black or African American, while Curtis is white.

147. Curtis circulated the GIF/meme to the watch chat group on April 7, 2021, a mere four (4) days after Mr. Harvey's death.

148. The hanging GIF or meme came to the attention of the Savannah Police Department's Internal Affairs Unit on April 26, 2021.

149. Curtis explained to Internal Affairs that when he sent the GIF/meme to the watch chat group that he was "just laughing at a dark [no pun intended] situation."

150. Following his interview with Internal Affairs regarding the GIF/meme, Curtis was placed on immediate administrative leave.

151. One white officer who was interviewed by Internal Affairs expressed the opinion that Curtis had sent the hanging GIF/meme to the wrong chat group and had instead intended to send it to another chat group composed of white officers only.

152. Even after the inappropriateness of the GIF/meme should have been apparent to Curtis, he lamented that an Internal Affairs investigation had been instigated because there was a "blue falcon" or snitch in the chat group to which he had sent the GIF/meme.

153. Hewett, one of the recipients of the hanging GIF/meme, was Curtis's supervisor.

154. While acknowledging that he received and viewed the GIF/meme, Hewett did not respond to it at all.

155. Though Hewett was Curtis's supervisor, he took no action whatsoever against Curtis in response to the hanging GIF/meme.

156. Neither did Hewett appear to address it with any other persons who received the hanging GIF/meme.

157. Following his interview with Internal Affairs regarding the GIF/mem, Tremblay was placed on immediate administrative leave.

158. Tremblay, one of the recipients of the hanging GIF/meme, was Curtis's supervisor.

159. Upon receiving the GIF/meme, Tremblay wrote back to the chat group that it was "too soon" to send the GIF/meme to Greene.

160. Though Tremblay was Curtis's supervisor, she took no action whatsoever against Curtis in response to the hanging GIF/meme.

161. Neither did Tremblay appear to address it with any other persons who received the hanging GIF/meme.

162. In explaining her inaction during a follow-up interview with Internal Affairs, Tremblay blamed the Police Department, stating that she had never been

trained to supervise, had never been to any leadership classes, and had not been to the LPO (Leadership in Police Organizations) training.

163. It was due to her lack of training, she contended, that she deferred to Hewett in any disciplinary-related matters, even though she had exercised supervisory authority over the watch for two years by the time of the hanging GIF/meme incident.

164. Following her interview with Internal Affairs regarding the GIF/mem, Tremblay was placed on immediate administrative leave.

165. The second investigation, examining the hanging GIF/meme, resulted in disciplinary action against three members of the City of Savannah's Police Department – Sgt. Christopher Hewett (terminated from employment); Cpl. Erica Tremblay (terminated from employment); and Officer David Curtis (terminated from employment).

<u>A Pattern of Disparate Treatment Based on Race</u>

166. Several officers interviewed by Internal Affairs in connection with the hanging GIF/meme stated that Hewett's non-reaction to it was not a surprise as he had a demonstrated pattern of treating minority officers less civilly and fairly than he treated non-minority officers.

167. Several officers interviewed by Internal Affairs in connection with the hanging GIF/meme stated that the failures by supervisors Hewett and Tremblay to take any action were not a surprise as both had a demonstrated pattern of acting as if minority officers didn't fit in and diminished the "feng shui" of the unit.

168. One of the officers interviewed by Internal Affairs offered the opinion that the racial animus that existed, from the watch's supervisors, contributed in part to no action being taken by the supervisors with respect to the hanging GIF/meme.

169. Tremblay admitted to Internal Affairs that there was a separate chat group created [that included white officers only] where they "essentially vented or expressed their concerns about Officer Greene" (a Black officer). Tremblay stated that she was the only supervisor who was a member of this chat group.

170. Though both are supervisors on their police watch, Hewett and Tremblay participated in police chat groups for their watch that excluded Black officers and included only white officers.

171. Upon information and belief, Defendant City of Savannah was aware of the racial animus some of its white officers held for Black officers and for Black suspects with whom they interacted.

172. Upon information and belief, this racial animus was reflected in how certain white police officers, including Defendant Leuschner, dealt with Black suspects.

173. Upon information and belief, this racial animus was reflected even in the failure of certain white police officers, to adhere to purely ministerial duties with respect to Black suspects.

## CAUSATION AND DAMAGES

174. The actions of each Defendant caused Mr. Harvey to endure violations of his constitutional and statutory rights prior to his death.

175. But for each Defendants violation(s) of his rights, as set forth below, Mr. Harvey would not have died in Defendant City of Savannah's Police Headquarters interview room.

176. Mr. Harvey suffered physical and mental pain and suffering before his death resulting from the Defendants' failure to activate the video surveillance system in the interview room, failure to have another investigator watching on video surveillance during Mr. Harvey's interview, and failure to leave someone with him in the interview room at all times.

177. Mr. Harvey's Estate is entitled to recover damages for his pre-death pain and suffering caused by each Defendant and for funeral and burial expenses.

178. The actions of each Defendant, as set forth herein, were a proximate cause of Mr. Harvey's death.

179. Plaintiffs Michael Harvey and Akeem Davis are entitled to recover the full value of his life from each Defendant.

## POLICY VIOLATIONS BY DEFENDANTS LEUSCHNER, KERR, AND WHITE

180. Defendants Leuschner, Kerr, and White committed violations of various policies of the City of Savannah's Police Department that constituted a proximate cause of the death of William Harvey.

### Video Surveillance System Not Activated During Interview

181. Savannah Police Department GO (General Order) #OPS-001 titled Criminal Investigations provides in pertinent part at Section V(B)(3) that "[a]nother investigator will monitor the interview through the video surveillance system as a coach to the interviewer [CALEA 42.2.10.d]."

182. The video surveillance system was not activated during the interview of Mr. William Harvey.

183. Defendant Leuschner made no effort to ensure that the video surveillance system was activated during Mr. Harvey's interview.

184. Defendant White likewise made no effort to ensure that the video surveillance system was activated during Mr. Harvey's interview.

185. The failure of the video surveillance system to be activated was a proximate cause of Mr. Harvey's death.

186. The decision not to activate the video surveillance system during Mr. Harvey's interview was made pursuant to an established practice at the City of Savannah's Police Headquarters to not routinely activate the video surveillance system during interviews of suspects.

187. The decision not to activate the video surveillance system during Mr. Harvey's interview was made pursuant to an established practice at the City of Savannah's Police Headquarters to not routinely activate the video surveillance system during interviews of suspects, even where the subject of the interview expresses statements indicating a strong likelihood of engaging in serious self-harm, including suicide.

188. The decision not to activate the video surveillance system during Mr. Harvey's interview was made pursuant to an established practice at the City of Savannah's Police Headquarters to not routinely activate the video surveillance system during interviews of suspects, even where the subject of the interview engages in acts of serious self-harm in the presence of the interviewing officer.

189. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of not routinely activating the video surveillance system during interviews of suspects.

190. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of not activating the video surveillance system during interviews of suspects, even where the subject of the interview expresses statements indicating a strong likelihood of engaging in serious self-harm, including suicide.

191. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of not activating the video surveillance system during interviews of suspects, even where the subject of the interview engages in acts of serious self-harm in the presence of the interviewing officer.

192. Activation of the video surveillance system during Mr. Harvey's interview would have allowed for others to observe his responses and actions and bring to the attention of Defendant Leuschner that there was a strong likelihood that Mr. Harvey might engage in acts of serious self-harm, including suicide.

193. Activation of the video surveillance system during Mr. Harvey's interview would also have allowed for others to observe his responses and actions

indicating the strong likelihood that he might engage in acts of serious self-harm, including suicide, and advise Defendant Leuschner not to leave Mr. Harvey alone in the interview room.

194. Upon information and belief, Mr. William Harvey failed to receive the ministerial protections of an activated video surveillance system.

195. Upon information and belief, Mr. William Harvey failed to receive the ministerial protections of an activated video surveillance system, based in whole or in part on his race and status as an apparent person of modest means.

## No Other Investigator Monitoring the Interview Through the Video Surveillance System

196. Savannah Police Department GO (General Order) #OPS-001 titled Criminal Investigations provides in pertinent part at Section V(B)(3) that "[a]nother investigator will monitor the interview through the video surveillance system as a coach to the interviewer [CALEA 42.2.10.d]."

197. During the interview of Mr. William Harvey there was no other investigator monitoring the interview through the video surveillance system.

198. Defendant Leuschner made no effort to ensure that there was another investigator monitoring the video surveillance system during Mr. Harvey's interview.

199. Defendant White likewise made no effort to ensure that there was another investigator monitoring the video surveillance system during Mr. Harvey's interview.

200. The absence of another investigator monitoring Mr. Harvey's interview through the video surveillance system was a proximate cause of the death of Mr. William Harvey.

201. The decision not to have another investigator monitoring Mr. Harvey's interview through the video surveillance system was made pursuant to an established practice at the City of Savannah's Police Headquarters to not have such monitoring routinely undertaken during interviews of suspects.

202. The decision not to have another investigator monitoring the video surveillance system present during Mr. Harvey's interview was made pursuant to an established practice at the City of Savannah's Police Headquarters to not have such monitoring routinely undertaken during interviews of suspects, even where the subject of the interview expresses statements indicating a strong likelihood of engaging in serious self-harm, including suicide.

203. The decision not to activate the video surveillance system during Mr. Harvey's interview was made pursuant to an established practice at the City

of Savannah's Police Headquarters to not routinely have another investigator monitoring the video surveillance system during interviews of suspects, even where the subject of the interview engages in acts of serious self-harm in the presence of the interviewing officer.

204. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of not having another investigator monitoring the video surveillance system during interviews of suspects.

205. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of not having another investigator monitoring the video surveillance system during interviews of suspects, even where the subject of the interview expresses statements indicating a strong likelihood of engaging in serious self-harm, including suicide.

206. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of not having another investigator monitoring the video surveillance system during interviews of suspects, even where the subject of the interview engages in acts of serious self-harm in the presence of the interviewing officer.

207. Another investigator monitoring the video surveillance system during Mr. Harvey's interview could have observed Mr. Harvey's efforts to hang himself and could have summoned the two officers who were positioned just outside of the interview room.

208. The monitoring of the video surveillance system during the interview literally could have saved Mr. Harvey's life, particularly in that he used a shoestring to hang himself.

209. Upon information and belief, Mr. William Harvey failed to receive the protection of a routinely activated and monitored video surveillance system.

210. Upon information and belief, Mr. William Harvey failed to receive the protection of an activated and monitored video surveillance system, based in whole or in part on his race and status as an apparent person of modest means.

<u>Failure to ensure Video Cameras Working Properly</u>

211. Savannah Police Department GO (General Order) #OPS-010 titled "Video/Audio Recording Equipment" provides in pertinent part at Section IV(A) that "[p]rior to using the interview room wherein events are to be recorded, the interviewing detective/officer shall ensure that the video cameras are working properly prior to starting the interview."

212. Defendant Leuschner, as the interviewing detective/officer, failed to ensure that the video cameras in the interview room were working properly before starting the interview with Mr. Harvey.

   Mr. Harvey Should Not Have Been Left Alone in the Interview Room

213. Savannah Police Department "SPD" General Procedure OPS-001 states in pertinent part at Section V(B)(4) that "Suspects or potential suspects will be kept under direct supervision and will not be left alone while in the interview room [CALEA 42.2.10b]."

214. Defendant Leuschner twice left Mr. Harvey alone in the interview room during his interview, each time with the door to the room closed.

215. Leaving Mr. Harvey alone in the interview room, with its door closed, was a proximate cause of Mr. Harvey's death.

216. The decision to leave Mr. Harvey alone in the interview room was made pursuant to an established practice at the City of Savannah's Police Headquarters to leave suspects alone in the interview room, with its door closed.

217. The decision to leave Mr. Harvey alone in the interview room was made pursuant to an established practice at the City of Savannah's Police Headquarters, even when the subject of the interview expresses statements

indicating a strong likelihood of engaging in serious self-harm, including suicide.

218. The decision to leave Mr. Harvey alone in the interview room was made pursuant to an established practice at the City of Savannah's Police Headquarters, even when the subject of the interview engages in acts of self-harm in the presence of the interviewing officer.

219. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of allowing detectives and officers interviewing suspects to leave them alone in the interview room, including with the door closed.

220. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of allowing detectives and officers interviewing suspects to leave them alone in the interview room, even when the subject of the interview expresses statements indicating a strong likelihood of engaging in serious self-harm, including suicide.

221. Upon information and belief, the City of Savannah's Police Headquarters, with the knowledge of Chief Minter, had a routine of allowing detectives and officers interviewing suspects to leave them alone in the interviewing room,

even when the subject of the interview has engaged in acts of self-harm in the presence of the interviewing officer.

222. Defendant Leuschner had two officers positioned outside the interview room when she left Mr. Harvey alone inside. Either of these two officers could have been assigned to remain inside the room with Mr. Harvey during her absence. This simple directive would have saved Mr. Harvey's life.

223. Leaving Mr. Harvey alone in the interview room was a particularly egregious decision given Mr. Harvey's previous statements indicating a strong likelihood that he might engage in serious self-harm.

224. Leaving Mr. Harvey alone in the interview room was a particularly egregious decision given Mr. Harvey's previous acts of self-harm, e.g., forcefully banging his head on the table, that had occurred in Defendant Leuschner's presence.

225. Leaving Mr. Harvey alone in the interview room in the face of a specific ministerial directive to the contrary was a proximate cause of Mr. Harvey's death.

226. Upon information and belief, Mr. William Harvey failed to receive the ministerial protections of not being left alone in the interview room.

227. Upon information and belief, Mr. William Harvey failed to receive the ministerial protections of not being left alone in the interview room, based in whole or in part on his race and status as an apparent person of modest means.

Violation of Employee Responsibility

228. Savannah Police Department GO (General Order) #ADM-002 titled "Organization and Direction" provides in pertinent part at Section V(A) under "Employee Responsibility" "to be managed effectively, personnel should understand their duties and responsibilities. These duties are detailed in Job Descriptions located on the City of Savannah network. Each employee will be held accountable for their duties and responsibilities."

229. By not ensuring that the video system in the interview room was in proper working order, Defendant Leuschner violated her employment responsibility under Savannah Police Department GO (General Order) #OPS-010 titled "Video/Audio Recording Equipment" that provides in pertinent part at Section IV(A) that "[p]rior to using the interview room wherein events are to be recorded, the interviewing detective/officer shall ensure that the video cameras are working properly prior to starting the interview."

230. By not making sure that the video surveillance in the interview room was activated during Mr. Harvey's interview, Defendant Leuschner violated her

employment responsibility under Savannah Police Department GO (General Order) #OPS-001 titled Criminal Investigations that provides in pertinent part at Section V(B)(3) that "[a]nother investigator will monitor the interview through the video surveillance system as a coach to the interviewer [CALEA 42.2.10.d]."

231. By not making sure there was another investigator monitoring the video surveillance of the interview with Mr. Harvey, Defendant Leuschner violated her employment responsibility under Savannah Police Department GO (General Order) #OPS-001 titled Criminal Investigations that provides in pertinent part at Section V(B)(3) that "[a]nother investigator will monitor the interview through the video surveillance system as a coach to the interviewer [CALEA 42.2.10.d]."

232. By leaving Mr. Harvey alone in the interview room Defendant Leuschner violated her employment responsibility under Savannah Police Department "SPD" General Procedure OPS-001 that stated in pertinent part at Section V(B)(4) that "Suspects or potential suspects will be kept under direct supervision and will not be left alone while in the interview room [CALEA 42.2.10b]."

233. By leaving Mr. Harvey alone in the interview room Defendant White violated his employment responsibility under Savannah Police Department "SPD" General Procedure OPS-001 that stated in pertinent part at Section V(B)(4) that "Suspects or potential suspects will be kept under direct supervision and will not be left alone while in the interview room [CALEA 42.2.10b]."

234. The hanging GIF/meme incident shows the race-based environment of the B-Watch of the Eastside Precinct, as reflected in the sending of the GIF/meme, as reflected in the confidence that such a GIF/meme could be sent without worry about consequences from B-Watch Eastside Precinct supervisors, as reflected in the indifference of many of the white recipients of the GIF/meme, as reflected in the non-reaction of supervisory personnel who received the GIF/meme, as reflected in the racially exclusive chat groups within the B-Watch of the Eastside Precinct, and as reflected in the wholesale failure of B-Watch Eastside Precinct supervisory personnel to address the GIF/meme in any way.

Failure to Seek Medical/Mental Health Care for Mr. Harvey

235. The policies of the City of Savannah's Police Department provided that "[t]he arresting officer is responsible for the safety and protection of the arrested person while in his/her custody.  Defendant Leuschner was required to ensure

that Mr. Harvey was given the opportunity for medical care (SPD ADM-004 10.02; SPD ADM-004 DD).

236. Mr. Harvey's suicidal statements and his self-infliction of harm by banging his head on the table coupled with his demonstrated mental health conditions required that Defendant Leuschner, Defendant White, and the other involved officers to comply with the policy of Savannah General Order regarding Crisis Intervention, MENTAL ILLNESS RECOGNITION (CALEA 41.7.7a). Specifically, it provides that "[i]t is imperative that officers be aware of the following universal behaviors that are strong indicators of an altered mental state: *They may behave in a way dangerous to themselves or to others*" (SPD OPS-014 1.A).

237. Here, as discussed in detail above, Mr. Harvey was making repeated statements that reflected an intention to engage in serious self-harm and demonstrated this intention by banging his head on the table, making it incumbent on the officers interacting with him to seek medical attention for mental health needs that were obvious.

238. It is also incumbent on an officer encountering exhibiting symptoms of being mentally ill or an impaired person to: *Take time to evaluate the situation*. Defendant Leuschner failed to evaluate the situation as evidenced by her

willingness to twice leave Mr. Harvey without direct supervision. (SPD OPS-014 41.2.7c).

239. Defendant Leuschner failed to properly (if at all) evaluate the situation and provide Mr. Harvey with "crisis intervention service in a safe and timely manner" (SPD OPS-014 2.C).

240. The failure of Defendants Leuschner and White to summon medical assistance for Mr. Harvey was a proximate cause of Mr. Harvey's death.

## Count I

### Violation of Ministerial Duties and Negligence Under Georgia Law Against Defendant Leuschner Arising From Failures Related to Video Camera Surveillance System And Leaving Mr. Harvey Alone In the Interview Room

241. The failure to ensure that the video camera system was working in the interview room prior to the commencement of Mr. Harvey's interview was the violation of a ministerial duty.

242. The failure to ensure that the video camera system was activated during Mr. Harvey's interview was the violation of a ministerial duty.

243. The failure to ensure that an investigator monitored the video camera surveillance system during Mr. Harvey's interview was the violation of a ministerial duty.

244. The failure to make sure that someone was with Mr. Harvey inside the interview room at all times was the violation of a ministerial duty. This breach applies to both Defendant Leuschner and Defendant White.

245. To the extent that these duties are not ministerial duties, Defendant Leuschner acted with malice, i.e., deliberate intention to do wrong, when they failed in the above particulars.

246. The actions of Defendants Leuschner and White amount to more than mere policy violations as they knowingly failed to protect Mr. Harvey when they knew there to be a strong likelihood based on his words and actions that he might engage in the infliction of serious self-harm.

247. Defendants Leuschner and White failed to take actions easily within their control that could have saved Mr. Harvey's life, yet they deliberately did not take any action to prevent his suicide.

248. The above-cited violations of ministerial duties were a proximate cause of Mr. William Harvey's injuries, damages, and death.

<u>**Count II**</u>
<u>**Deliberate Indifference Under 42 U.S.C. § 1983**</u>
<u>**Against Defendants Leuschner and White**</u>

249. Defendant Silver Leushcner has given deposition testimony in this case under the Court's limited discovery order. References to her deposition in this

Second Amendment to Complaint refer to her November 8, 2023, deposition testimony.

250. Defendant Leuschner was interviewed by the Georgia Bureau of Investigation on April 3, 2021, in connection with the death of William Harvey. With Defendant Leuschner's permission an audio recording was made of that interview.

251. Defendant Leuschner was interviewed by the City of Savannah's Internal Affairs Unit on April 12, 2021, in connection with Mr. William Harvey's death.

252. Defendant Leuschner was terminated by the City of Savannah's Police Department as a result of her role in Mr. William Harvey's death.

253. Defendant Matthew White has given deposition testimony in this case under the Court's limited discovery order. References to his deposition in this Second Amendment to Complaint refer to his November 8, 2023, deposition testimony.

254. Defendant White was interviewed by the Georgia Bureau of Investigation on April 3, 2021, in connection with the death of William Harvey. With Defendant White's permission an audio recording was made of that interview.

255. Defendant White was interviewed by the City of Savannah's Internal Affairs Unit on April 20, 2021, in connection with Mr. William Harvey's death.

256. Defendant White was suspended by the City of Savannah's Police Department ("Department") for his role in Mr. William Harvey's death. As of November 8, 2023, Defendant White remained employed with the Department.

257. Defendant Michael Kerr has given deposition testimony in this case under the Court's limited discovery order. References to his deposition in this Second Amendment to Complaint refer to his November 8, 2023, deposition testimony.

258. Defendant Kerr twice appeared before and was twice questioned by the City of Savannah Police Department's Internal Affairs Unit in connection with Mr. Harvey's death.

259. Defendant Kerr was initially terminated for his supervisory role in Mr. William Harvey's death. His termination was subsequently rescinded, and he was demoted from Sergeant to Corporal. As of November 8, 2023, Defendant Kerr remained employed with the City of Savannah's Police Department.

260. Rodheem Greene was a police officer with the City of Savannah's Police Department on April 2-3, 2021. His employment with the Savannah Police Department was terminated for reasons unrelated to the matters at issue in this lawsuit. Rodheem Greene has given deposition testimony in this case under the Court's limited discovery order. References to his deposition in this

Second Amendment to Complaint refer to his November 9, 2023, deposition testimony.

261. Rodheem Greene was interviewed by the City of Savannah Police Department's Internal Affairs Unit on April 12, 2021, in connection with Mr. William Harvey's death.

262. Robert Gavin is the Assistant Chief over management information for the Savannah Police Department and was designated as the 30(b)(6) corporate representative for the City of Savannah. Chief Gavin has given testimony in this case under the Court's limited discovery order. References to his deposition in this Second Amendment to Complaint refer to his November 9, 2023, deposition testimony.

263. This Count is brought against Defendant Leuschner in her individual capacity for a violation of Mr. Harvey's Fourteenth Amendment rights.

264. This Count is brought against Defendant White in his individual capacity for a violation of Mr. Harvey's Fourteenth Amendment rights.

265. This Count is brought against Defendant Kerr in his individual capacity for a violation of Mr. Harvey's Fourteenth Amendment rights.

266. Defendants Leuschner and White were subjectively aware of the strong likelihood that Mr. Harvey might engage in an act of serious self-harm, including suicide, disregarded that risk, and their conduct was more than gross negligence.[2]

267. The Georgia Pattern Jury Instructions for Civil Cases defines gross negligence (§ 60.030. TORTS; GROSS NEGLIGENCE (SLIGHT DILIGENCE) as follows: "In general, slight diligence or care is the degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances. The absence of slight care is termed gross negligence."

268. Defendants Leuschner and White were directly involved in the violation of Mr. William Harvey's civil rights and their direct involvement caused or contributed to Mr. Harvey's death.

---

[2] In Wade v. McDade, 67 F.4th 1363 (11th Cir. May 22, 2023), a three-judge panel of the Eleventh Circuit Court of Appeals sought to clear up the case law confusion on the mens rea a plaintiff must prove to make out an Eighth Amendment deliberate indifference claim, i.e., whether it must be shown that the defendant acted with "more than mere negligence" or with "more than gross negligence." The Eleventh Circuit held that the "more than gross negligence" standard governed Eighth Amendment deliberate indifference claims. Subsequently, however, the Eleventh Circuit granted a rehearing en banc and vacated the three-judge panel's ruling, Wade v. Ga. Corr. Health, LLC, 83 F.4th 1332 (11th Cir. Oct. 11, 2023). The rehearing matter remains pending before the Eleventh Circuit. Following the grant of a rehearing en banc, Judge Louis Sands of the Middle District of Georgia considered the mere versus gross negligence question and followed the more than gross negligence standard enunciated in Wade v. McDade, see Winters v. Bryant, 2023 U.S. Dist. LEXIS 204910 at (A) (M.D. Ga. Nov. 15, 2023). At this point it remains unclear how the full panel of the Eleventh Circuit will decide the mere negligence-versus-gross negligence question

269. Defendant Kerr failed to adequately supervise Defendant Leuschner and also failed to adequately supervise Defendant White and Officer Greene in connection with their involvement with Mr. Harvey. These direct and supervisory failures caused or contributed to Mr. Harvey's death.

## DEFENDANT SILVER LEUSCHNER

270. Defendant Leuschner interviewed Mr. Harvey in the third-floor headquarters of the Savannah Police Department on April 2, 2021, and was the lead detective on the investigation of whether Mr. Harvey had committed an aggravated assault against another individual.

271. Based on her personal interaction with Mr. Harvey, Defendant Leuschner was aware of the strong likelihood that Mr. Harvey would engage in serious self-harm, including suicide.

272. Defendant Leuschner reported the following to the Georgia Bureau of Investigation as having transpired during her interview of Mr. Harvey: a) he was mumbling and getting emotional; b) he was crying; c) he stated that he would "rather die" than go to jail; d) he stated "I'm not going back to jail, you all will have to kill me"; e) he "became very upset"; f) he "banged his head on the table and appeared to be in shock"; g) he was "emotional as hell"; h)

he was "really depressed"; i) he yelled unintelligibly; and j) he was "saying all that crazy stuff that people say when they're upset."

273. Defendant Leuschner reported to the GBI that Mr. Harvey told her the following during her interview about his mental condition: a) that he suffered from schizophrenia; b) that he suffered from bipolar disorder; c) that he suffered from depression; d) that he had consumed Zoloft; and e) that he had been drinking alcohol.

274. Defendant Leuschner testified during her deposition that she had no specific recollection of ever receiving any police or other training as to schizophrenia, as to what schizophrenia was, or how to calm down someone with schizophrenia (Leuschner Depo at 48:4 – 49:13).

275. Defendant Leuschner had no specific recollection of ever receiving any police training in how seriously to take the statement by someone suffering from schizophrenia that he would rather die than go to jail (Leuschner Depo at 49:14-21).

276. Defendant Leuschner testified during her deposition that she had no specific recollection of ever receiving any police or other training as to bipolar disorder, as to what bipolar disorder was, or how to calm down someone with bipolar disorder (Leuschner Depo at 50:1 - 17).

277. Defendant Leuschner had no specific recollection of ever receiving any police training on what the combined effects of Zoloft and alcohol are on a person's mental state (Leuschner Depo at 51:5-9).

278. Defendant Leuschner had no specific recollection of ever receiving any police training in how to evaluate the seriousness of Mr. Harvey's statement that he would rather die than go to jail when considered with the facts that he suffers from schizophrenia, suffers from bipolar disorder, suffers from depression, has taken Zoloft, and has consumed some amount of alcohol (Leuschner Depo at 51:18 – 52:3).

279. Defendant Leuschner was not competent to evaluate Mr. Harvey's mental state on April 2, 2021 (Leuschner Depo at 57:5-12).

280. Based on her personal interaction with Mr. Harvey during her interview with him, Defendant Leuschner was aware of the strong likelihood of the risk that Mr. Harvey would engage in serious self-harm, including suicide.

281. Following her interview with Mr. Harvey, Defendant Leuschner left him alone in the interview room with the door closed and departed from the police headquarters building.

282. Upon the conclusion of her interview with Mr. Harvey, Defendant Leuschner left the door to the interview room closed, but left Defendant White and Officer Greene sitting outside the closed interview room door.

283. Defendant Leuschner provided Defendant White and Officer Greene with no specific instructions about what to do when she left the door to the interview room closed and departed the Police Headquarters building.

284. Defendant Leuschner never told Defendant White and/or Officer Greene that they should open the door and either remain inside the room with Mr. Harvey or otherwise maintain direct, continuous visual observation of him.

285. Defendant Leuschner admitted that she was never supposed to leave Mr. Harvey alone in the interview room (with the door closed) (Leuschner at 62:13-16).

286. Defendant Leuschner admitted to the Internal Affairs Unit that it was common practice for her not to activate the video surveillance system and to use her body-worn camera instead.

287. Defendant Leuschner stated that she was trained, that she had the option to use her body-worn camera during an interview of a detainee or activate the video surveillance system (Leuschner Depo at 96:3-7).

288. In other words, Defendant Leuschner admitted that it was her custom to disregard the policy requiring activation of the video surveillance system and the presence of an independent investigator to monitor the interview room while Mr. Harvey was present in it, through the video surveillance system.

289. Having the video surveillance system activated during an interview of a detainee was mandatory (Gavin Depo at 49:1-8).

290. By her own admission, however, during part of her interview with Mr. Harvey, Defendant Leuschner did not have her body-worn camera activated (Leuschner Depo at 28:12-24).

291. Defendant Leuschner acknowledged during the formal investigation of Mr. Harvey's death that she spoke to him for a period of several minutes in the closed-door interview room without her body-worn camera activated (Leuschner Depo at 28:16-24).

292. Having an investigator monitor the video surveillance system in the room where an interview of a detainee was being conducted was mandatory (Gavin Depo at 50:2-6).

293. With knowledge that there was no camera surveillance monitoring of the interview room it was even more incumbent on Defendant Leuschner to make sure that Defendant White and Officer Greene did not leave Mr. Harvey alone

in the closed-door interview room or maintain direct and continuous physical observation of Mr. Harvey.

294. Defendant Leuschner stated that it was not the policy of the City of Savannah's Police Department in August 2021 to remove shoestrings from a detainee left alone in an interview room with the door closed (Leuschner Depo at 62:17-24).

295. Defendant Leuschner did not remove Mr. Harvey's shoestrings before leaving him alone in the closed-door interview room. Defendant Leuschner did not arrange for the removal of Mr. Harvey's shoestrings.

296. Defendant Leuschner showed deliberate indifference by failing to make sure the video surveillance system into the interview room was operational before she began her interview with Mr. Harvey, a mandatory requirement of the City of Savannah's Police Department on April 2-3, 2021.

297. Defendant Leuschner showed deliberate indifference by failing to make sure that an investigator was monitoring the video surveillance system into the interview room before she began her interview with Mr. Harvey, a mandatory requirement of the City of Savannah's Police Department on April 2-3, 2021.

298. Defendant Leuschner showed deliberate indifference by failing to make sure that Mr. Harvey was not left alone in the interview room with the door closed

when she left the police headquarters building following her interview with Mr. Harvey. Not leaving Mr. Harvey alone was a mandatory requirement of the City of Savannah's Police Department on April 2-3, 2021.

299. Defendant Leuschner showed deliberate indifference by failing to provide Defendant White and Officer Greene with specific instructions about how to protect and safeguard Mr. Harvey.

300. Defendant Leuschner showed deliberate indifference by failing to arrange for direct and continuous visual observation of Mr. Harvey when she left the headquarters building following her interview with Mr. Harvey. Direct and continuous visual observation was a mandatory requirement of the City of Savannah's Police Department on April 2-3, 2021.

301. Defendant Leuschner never communicated to Defendant White or Officer Greene what Mr. Harvey had told her about his mental condition. This should have been communicated to them, particularly if it was her intention to leave closed the door to the interview room.

302. Defendant Leuschner showed deliberate indifference by failing to make sure that items Mr. Harvey could potentially use to harm himself were removed from the interview room once he was left inside the room alone with the door closed.

303. Defendant Leuschner showed deliberate indifference by not communicating to Defendant White or Officer Greene what Mr. Harvey told her about preferring to die rather than go to jail.

304. Defendant Leuschner showed deliberate indifference by not communicating to Defendant White or Officer Greene that Mr. Harvey had banged his head on the interview room table while being interviewed.

305. Defendant Leuschner showed deliberate indifference by not communicating to Defendant White or Officer Greene that they should remove any items from the interview room that Mr. Harvey could use to harm himself.

306. Defendant Leuschner showed deliberate indifference by being unfit to assess Mr. Harvey's mental condition and ignoring her ministerial and other duties in paragraphs 36 through 55 above.


## DEFENDANT MATTHEW WHITE

307. Defendant White spent his entire law enforcement career with the City of Savannah's Police Department (White Depo at 13:21 – 14:3).

308. Defendant White was the primary officer on the April 2021 case involving Mr. William Harvey (White Depo at 19:5-9).

309. After conducting a preliminary investigation at the scene of the alleged aggravated assault incident involving Mr. Harvey, Defendant White returned to police headquarters.

310. Defendant White then went to the third-floor interview room, where Defendant Leuschner was interviewing Mr. Harvey in the closed-door interview room.

311. Upon arriving on the third-floor, Defendant White found Officer Rodheem Greene seated outside the closed interview room door. It was apparent to him that Defendant Leuschner was interviewing Mr. Harvey.

312. Once Defendant Leuschner completed her interview with Mr. Harvey, she emerged from the interview, closing the door to the interview room behind her.

313. Defendant Leuschner stated that she closed the door because she did not want Mr. Harvey to hear what she was saying to Defendant White and Officer Greene concerning her doubts about Mr. Harvey being guilty of the aggravated assault (Leuschner Depo at 65:13-16).

314. Defendant Leuschner told Defendant White and Officer Greene that she was leaving headquarters to go to the hospital to interview the victim of the alleged aggravated assault.

315. Defendant Leuschner left the door to the interview room closed when she left the third-floor area and departed from police headquarters.

316. Though both White and Greene saw the door to the interview room closed and were aware this meant that Mr. Harvey was inside alone, neither opened the door, continuing to sit outside it.

317. Sitting outside the closed door without opening it was how White and Greene thought "it was done at the time" (White Depo at 27:14-18).

318. Defendant White did not open the door and enter the closed interview room until approximately forty-eight minutes after Defendant Leuschner left the door closed and exited the police headquarters building.

319. When Defendant White finally entered the interview room he found Mr. Harvey dead, the victim of suicide by hanging.

320. Mr. Harvey used one of the strings from the shoes he was wearing to hang himself inside the interview room.

321. Though Defendant White was aware that Mr. Harvey was alone inside the closed-door interview room, he had never been trained to enter inside to make

sure there was nothing the detainee could use to harm himself (White Depo at 32:3-9).

322. Checking to make sure that there was nothing inside an interview room a detainee could use to harm himself was not a part of Defendant White's normal practice (White Depo at 32:11-16).

323. Checking to make sure that there was nothing inside an interview room a detainee could use to harm himself was not something Defendant White was trained by the City of Savannah Police Department to do (White Depo at 32:3-9)

324. During Defendant Leuschner's interview, Defendant White could hear that Mr. Harvey was "pretty loud."

325. During Defendant Leuschner's interview, Defendant White could hear Mr. Harvey say that he did not want to go back to jail.

326. Defendant White would have been responsible for Mr. Harvey's safety while Defendant Leuschner was interviewing him (White Depo at 42:1-4).

327. Once Defendant Leuschner left the police headquarters building, Defendant White would have been responsible for Mr. Harvey's safety (White Depo at 42:5-8).

328. Defendant White acknowledged that as a police officer he often encountered individuals with mental health issues (White Depo at 15:12-15).

329. Based on his personal interaction with Mr. Harvey at the scene and hearing Mr. Harvey during Defendant Leuschner's interview with him, Defendant White was aware of the strong likelihood of the risk that Mr. Harvey would engage in serious self-harm, including suicide.

330. Defendant White told the Internal Affairs Unit of the City of Savannah's Police Department that he was not aware of the policy stating that no detainee should be left alone in an interview room.

331. Internal Affairs produced a copy of a document showing that Defendant White signed for and received a copy of the policy on August 20, 2020.

332. Defendant White admitted to Internal Affairs that he had not provided "suitable attention" to Mr. Harvey.

333. Defendant White showed deliberate indifference by not opening the door to the interview room until approximately forty-eight (48) minutes after Defendant Leuschner's departure from the SPD headquarters building.

334. Defendant White showed deliberate indifference by failing to maintain direct and continuous visual observation of Mr. Harvey, while Mr. Harvey was handcuffed and alone inside the closed-door interview room.

<u>Former SPD Officer Rodheem Greene</u>

335. Former SPD Officer Rodheem Greene transported Mr. Harvey from the scene of the alleged aggravated assault incident to the Savannah Police Department headquarters on April 2, 2021.

336. Greene described Mr. Harvey as being "upset" during the transport.

337. Defendant Leuschner, Defendant Green and arrived at SPD headquarters at approximately the same time and went up to the third-floor interview room area together.

338. While Defendant Leuschner conducted the interview of Mr. Harvey, Defendant White and Officer Greene sat outside the closed-door interview room.

339. When Defendant Leuschner left the police headquarters to go to continue her investigation she left Greene and Defendant White still sitting outside the closed interview room door, with Mr. Harvey alone inside.

340. Defendant Leuschner did not give Greene or Defendant White any specific instructions regarding Mr. Harvey, including how to provide for his safety and protection.

341. Defendant Leuschner did not mention to Greene or Defendant White anything about what Mr. Harvey had told her about his mental condition (Greene Depo at 51:6-9).

342. Defendant Leuschner did not mention to Greene or Defendant White anything about statements Mr. Harvey made to her during the course of the interview, including statements relating to preferring death over going to jail (Greene Depo at 52:9-12).

343. Defendant Leuschner did not mention to Greene or Defendant White that Mr. Harvey had banged his head against the table in the interview room (Greene Depo at 53:3-8).

344. The only instruction Defendant Leuschner provided to Greene or Defendant White was that if they heard anything from inside the interview room that they should check on Mr. Harvey (Greene Depo at 62:13-20).

345. Once Defendant Leuschner left the interview room and departed from police headquarters, Greene and Defendant White had direct responsibility for Mr. Harvey's safety and protection (Greene Depo at 63:15-18).

## MR. HARVEY'S DEATH WAS PREVENTABLE

346. If certain written polices of the City of Svannah's Police Department had been followed, Mr. Harvey's death would have been preventable (Gavin Depo at 60:2-6).

347. Once Defendant Leuschner left the SPD headquarters Defendant White and Officer Greene would have been directly responsible for Mr. Harvey's safety and protection (Gavin Depo at 68:5-9).

348. At the time of Mr. Harvey's suicide, Defendant White and Greene would have been directly responsible for Mr. Harvey's safety and protection (Gavin Depo at 68:10-14).

349. The simple act of making sure that Mr. Harvey was not alone in the interview room would have saved Mr. Harvey's life.

350. Having another person in the room might have altogether discouraged Mr. Harvey from even attempting to take his own life.

351. Having another person in the room would have allowed that person to physically challenge any effort by Mr. Harvey to take his own life.

352. Having an investigator monitoring the interview room over the surveillance video system would have allowed the investigator to thwart any suicide attempt by Mr. Harvey.

353. The Defendants were aware that they had failed to comply with rules and regulations of the City of Savannah's Police Department and knew that these failures put Mr. Harvey at greater risk as their failures would provide him with the opportunity to carry out his expressed intent of seriously harming himself, including taking his own life.

354. The actions of Defendants Leuschner and White amount to more than mere policy violations as they knowingly failed to protect Mr. Harvey when they knew there to be a strong likelihood based on his words and actions of a risk that he might engage in the infliction of serious self-harm, including suicide.

355. The purpose of the ministerial and other duties cited herein is to decrease the likelihood of self-harm or suicide by a suspect and to increase the chances for a detective/officer to intervene in the event a suspect attempted to inflict serious self-harm, including attempting suicide.

356. Defendants Leuschner, Kerr, and White failed to take actions easily within their control that could have saved Mr. Harvey's life, yet they deliberately did not take any action to prevent his suicide.

357. Defendants Leuschner, Kerr, and White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by leaving him alone in the interview room.

358. Defendants Leuschner, Kerr, and White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by leaving him alone in the interview room without making sure that the video surveillance camera system in the room was operational.

359. Defendants Leuschner, Kerr, and White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by leaving him alone in the interview room without making sure that the video surveillance camera system in the room was operational and being actively monitored by another person.

360. Defendants Leuschner, Kerr, and White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by not leaving the door to the interview room open so that the two officers stationed directly outside the room's door could physically view Mr. Harvey at all times.

361. Defendants Leuschner and Kerr disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey when they knew that the video surveillance camera was not operational and not being monitored, by closing the door to the interview room, thereby preventing the two officers positioned directly outside the interview room from visually observing Mr. Harvey at all times.

362. Defendants Leuschner and Kerr disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by not directing the two officers stationed directly outside the door of the interview room to check on Mr. Harvey at regular intervals.

363. Defendant White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by not opening the door to the interview room while Mr. Harvey was in there alone and by not opening the door so that he or someone else could visually observe Mr. Harvey at all times.

364. It has long been clearly established that deliberate indifference to a pretrial detainee's serious risk of harm, as alleged under the Plaintiffs' version of what occurred, violates The Fourteenth Amendment to the U.S. Constitution.

365. Pretrial detainees, like Mr. Harvey, have the right to be protected from serious self-harm, including suicide.

366. The Defendants' failure to safeguard and protect Mr. Harvey violated Mr. Harvey's constitutional rights.

367. Under the facts and circumstances herein, the Defendants' failure to protect Mr. Harvey from self-inflicted injuries, including suicide, was a violation of Mr. Harvey's constitutional rights.

368. Such violations of Mr. William Harvey's constitutional rights were a moving force and direct/proximate cause of his injuries, death, and damages.

## Count III

### Supervisory Liability and Monell Liability Under 42 U.S.C. § 1983 Against former Chief of Police Minter in his individual capacity, and against Defendants Leuschner and Kerr

369. This Count is alleged against the Chief of Police in his individual and official capacities for three different theories of liability: the unconstitutional conditions of Mr. Harvey's presence in the interview room; the denial of protection to Mr. Harvey from his own suicidal impulses while he was in the Police Department's interview room; and the denial of any needed medical/mental health care to Mr. Harvey.

370. Defendant Chief Minter was at all times relevant herein, responsible for overseeing the City of Savannah's Police Department and to ensure that suspects brought to police headquarters to be interviewed were protected from inflicting serious self-harm, including suicide.

371. The Chief of Police acts as an arm of the City of Savannah as he sets policy and oversees practices which relate to protecting suspects brought to police headquarters to be interviewed from inflicting serious self-harm, including suicide.

372. Defendant Chief Minter was at all times relevant herein the final policymaker of the City of Savannah's Police Department.

373. Upon information and belief Defendant Minter and supervisors working under him promulgated, enforced, and permitted to exist customs and policies that allowed police officers to fail to perform required safety procedures for suspects suffering from mental health issues being interviewed in the City of Savannah's Police Department's interview room.

374. Upon information and belief, the Defendant Minter had knowledge of a history of failure of the City of Savannah's detectives and officers while conducting interviews with suspects to make sure the video camera surveillance system was operational, to actually activate the video camera surveillance system, to ensure that another investigator monitored the video camera surveillance system during the interview, and to make sure that a suspect was never left alone in an interview room.

375. Based on the past actions of his detectives/officers in conducting interviews in the Department's interview room, Defendant Chief Minter knew that his subordinates would act unlawfully with respect to Mr. Harvey, yet he failed to stop them from doing so.

376. Defendant Minter, as Chief of Police, was aware at all times relevant herein that the officers under his authority frequently encountered detainees/arrestees with serious mental health conditions that put them at serious risk for engaging in acts of self-harm, if adequate constitutional safeguards were not put in place, which are the subject of adequate training and meaningful enforcement.

377. Defendants Leuschner, Kerr, and White did not act alone in their deliberate indifference. They were aided and abetted by Defendant Minter, as a supervisory representative of Defendant City of Savannah, who failed in his role as Chief of Police: a) to make sure that officers who interacted with detainees/arrestees during interviews were adequately trained in recognizing signs of mental conditions that suggested a strong likelihood that such detainee/arrestee might pose a serious risk of self-harm, including suicide; b) to adequately train concerning and to enforce policies that would prohibit detainees/arrestees from being left alone in interview rooms; c) to adequately train concerning and to enforce policies that would require the surveillance camera system to be operational at all times during a detainee/arrestee's interview room interview; d) to adequately train concerning and to enforce policies that would require an investigator to monitor the surveillance camera system while a detainee/arrestee was in the interview room, particularly when

a detainee/arrestee was left alone; e) to adequately train concerning and to enforce policies that would require officers left outside an interview room to visually monitor the inside of the room when if the interviewing detective left a detainee/arrestee alone in an interview room; f) to adequately train concerning and to enforce policies that would require officers to remove objects or items a detainee/arrestee left alone in a closed interview room, might use for self-harm, including suicide; and g) to engage in meaningful investigations and impose meaningful discipline on those who violated policies designed, in part, to recognize and prevent those with mental conditions that might put them at serious risk of self-harm from engaging in such conduct.  On April 3, 2021, these failures constituted the official policy of Defendant City of Savannah and its Police Department.

378. In the above-described particulars, Defendant Minter disregarded the strong likelihood of the risk of serious self-harm to Mr. William Harvey, and detainees/arrestees like him, with mental health conditions or facing a mental health crisis.

## PURPOSE OF POLICIES

379. Defendant City of Savannah has created and enforces certain policies to comply with its constitutional obligations (Gavin Depo at 73:20-23)

380. Defendant City of Savannah has developed, over time, certain policies to comply with its constitutional obligations to provide safety and protection to detainees, including Mr. Harvey. (Gavin Depo at 73:20 – 74:4).

381. Part of the purpose in enacting and enforcing certain policies is for the protection of the detainee while in the custody of the City of Savannah's Police Department (Gavin Depo at 31:13-15).

382. Direct supervision of Mr. Harvey required continuous visual observation of him (Gavin Depo at 46:20-23), though there was no document created by or for the City of Savannah's Police Department that defined what constituted direct supervision (Gavin Depo at 46:24 – 47:7).

383. Part of the purpose of the policy of not leaving a detainee alone in an interview room is for the protection of the detainee (Gavin Depo at 47:17-21).

384. Policies designed to meet the City of Savannah's constitutional duty to provide safety and protection to detainees are mandatory in nature (Gavin Depo at 74:5-7).

385. The City of Savannah agrees that the 14th amendment confers upon detainees like Mr. Harvey, the right to be protected from self-inflicted harm (Gavin Depo at 72:19-22).

386. The City of Savannah agrees that the 14th Amendment confers upon detainees like Mr. Harvey, the right to be free from suicide (Gavin Depo at 72:23 – 73:1).

## DEFENDANT LEUSCHNER'S SUPERVISORY LIABILITY

387. Supervisory liability under § 1983 may occur when the supervisor directly participates in the alleged unconstitutional conduct.

388. Defendant Leuschner, as a supervisor, directly participated in the unconstitutional conduct by not protecting Mr. Harvey from inflicting serious self-harm, including suicide.

389. On April 2, 2021, Defendant Leuschner interviewed Mr. Harvey in a police headquarters interview room with the door closed during the interview.

390. The policy of the Savannah Police Department required a detainee being interviewed to be under direct supervision at all times.

391. Direct supervision means continuous visual observation (Gavin Depo at 46:13-15).

392. Three times while interviewing William Harvey, Defendant Leuschner left William Harvey alone in an interview room with the door closed.

393. The third time Defendant Leuschner left Mr. Harvey in the interview room with the door closed, she left the police headquarters building, going to another location to continue her investigation of the matter involving Mr. Harvey.

394. Defendant Leuschner's intention was to return to the interview room to continue her interview with Mr. Harvey upon completing her offsite investigation.

395. By leaving Mr. Harvey alone in the interview room with the door closed, Defendant Leuschner did not make provision for the continuous visual observation of Mr. Harvey.

396. Leaving William Harvey alone in an interview room with the door closed and where continuous visual observation of him could not be accomplished was a customary practice that she engaged in and violated City of Savannah policy that expressly prohibited a detainee being interviewed from being left alone in an interview room with the door closed.

397. As the detective in charge of William Harvey's care while he was in custody in the interview room, Defendant Leuschner had a duty to make sure that Mr.

Harvey was not left alone in the interview room with the door closed. Specifically, her duty was to provide for direct visual observation of Mr. Harvey at all times while she undertook her offsite investigation.

398. Upon leaving the interview room on April 2, 2021, to conduct her offsite investigation, Defendant Leuschner left two officers (Defendant White and Officer Greene) outside the interview room where Mr. Harvey was left inside alone, with the door closed.

399. Despite being the detective in charge, Defendant Leuschner gave no instructions to the two officers she left outside the closed door of the interview room to maintain direct visual observation of Mr. Harvey.

400. Rather than exercising her supervisory duty and authority to instruct the two officers to maintain direct visual observation of Mr. Harvey during her absence, Defendant Leuschner assumed that they would open the door to maintain direct visual observation, because, as she stated - "they're officers just like me, they're not stupid."

401. Defendant Leuschner told the two officers positioned outside the closed interview room to check on Mr. Harvey if they heard anything from inside the interview room.

402. The two officers positioned outside the closed interview room did as Defendant Leuschner instructed them. They remained outside the closed interview room and listened for anything going on inside the room.

403. Defendant Leuschner never advised Officers Greene or White that they should maintain visual observation of Mr. Harvey at all times.

404. About forty-eight (48) minutes or so after Defendant Leuschner left the closed interview room, Officer White opened the door to check on Mr. Harvey, before going downstairs to retrieve materials to complete an unrelated report on which he was working (White Depo at 33:2-12; 48:13 – 49:3).

405. Upon opening the door and entering the interview room, Officers White and Greene found Mr. Harvey dead, the victim of suicide by hanging.

406. Both Officer White and Officer Greene agree that if Defendant Leuschner had left the door to the interview room open that Mr. Harvey's suicide might have been prevented (White Depo at 54:3-6); (Greene Depo at 82:15-23).

407. Defendant Leuschner never advised Officers White and Greene of the statements Mr. Harvey made, i.e., that he suffered from schizophrenia, suffered from bipolar disorder, suffered from depression, had consumed some amount of alcohol and Zoloft, that he would rather die than go back to jail,

that he had banged his head on the table, or was emotional as hell (Greene Depo at 51:4 – 53-8).

408. The expectation of Officer Greene and Officer White was that Defendant Leuschner would have advised them of Mr. Harvey's mental health condition and of some of the statements that Mr. Harvey made inside the closed interview room. (Green Depo at 55:16-23).

409. Had Defendant Leuschner communicated the above statements and actions to Officers Greene and White, they both agreed that they would have opened the door to the interview room to maintain direct visual observation of Mr. Harvey, as soon as Defendant Leuschner left the interview room and advised them she was leaving the headquarters building. (Greene Depo at 53:9-25) (White Depo at 54:12-17; 19-23).

410. Defendant Leuschner has supervisory liability for Mr. Harvey's death as she failed to adhere to the City of Savannah's written Police Department policy that required her to make sure that there be direct visual observation of Mr. Harvey at all times while he was in the interview room.

411. Defendant Leuschner, as a supervisor, directly participated in the unconstitutional conduct by not making sure that those under her authority protected Mr. Harvey from inflicting serious self-harm, including suicide.

412. Based on the above, there is an additional reason for supervisory liability against Defendant Leuschner, as an undeniable causal connection exists between Defendant Leuschner's role as a supervisor and Mr. Harvey's death as Defendant Leuschner's custom or policy resulted in the deliberate indifference to Mr. Harvey's constitutional rights.

<u>DEFENDANT KERR'S SUPERVISORY LIABILITY</u>

413. On April 2, 2021, Defendant Kerr was the night-time supervisor of the unit that oversaw cases involving domestic violence, robbery, and aggravated assault (Kerr Depo at 17:15-20).

414. As supervisor, Defendant Kerr's responsibilities are primarily administrative in nature (Kerr Depo at 20:1-8).

415. It was Defendant Kerr's responsibility to supervise Defendant Leuschner on April 2-3, 2021, with respect to Mr. William Harvey.

416. It was Defendant Kerr's responsibility on April 2-3, 2021, to make sure that Detective Leuschner complied with the general orders and standard operating procedures of the City of Savannah's Police Department (Kerr Depo at 46:18 – 24; 48:11-18).

417. Defendant Kerr's office was in the basement of the headquarters building, while the interview room where Defendant Leuschner was interviewing Mr. Harvey was located on the third floor of the headquarters building.

418. While Defendant Leuschner was interviewing Mr. Harvey, Defendant Kerr went up to the interview room, finding the interview ongoing, with the door to the interview room closed and Officers White and Greene sitting outside the door.

419. Defendant Kerr returned to his office but went back to the interview room sometime later after Defendant Leuschner's interview of Mr. Harvey had ended.

420. Defendant Kerr observed Officer Greene still seated outside the interview room door.

421. Defendant Kerr did not take note of whether the door to the interview room was closed.

422. Defendant Kerr then had a discussion with Defendant Leuschner in the third-floor aggravated assault office.

423. Defendant Leuschner told Defendant Kerr that she was about to leave the headquarters building to go to the hospital to interview the alleged aggravated assault victim.

424. Defendant Kerr did not ask Defendant Leuschner whether Mr. Harvey was alone in the interview room.

425. Defendant Kerr did not ask Defendant Leuschner whether the door to the interview room was closed.

426. Defendant Kerr did not ask Defendant Leuschner whether, in her absence, continuous visual observation would be maintained of Mr. Harvey.

427. Defendant Kerr did not ask Defendant Leuschner whether the video surveillance system was activated.

428. Defendant Kerr did not ask Defendant Leuschner whether an investigator was monitoring the interview room through the video surveillance system.

429. Defendant Kerr also did not ask Defendant Leuschner whether she had made certain that the interview room contained nothing Mr. Harvey could use to harm himself.

430. Defendant Leuschner made no mention to Defendant Kerr of any statements Mr. Harvey made to her about his mental condition, that Mr. Harvey had intentionally banged his head on the desk, or of his desire to die rather than go back to jail.

431. Defendant Kerr, as a supervisor, directly participated in the unconstitutional conduct by not protecting Mr. Harvey from inflicting serious self-harm, including suicide.

432. Defendant Kerr, as a supervisor, directly participated in the unconstitutional conduct by not making sure that those under her authority protected Mr. Harvey from inflicting serious self-harm, including suicide.

433. An undeniable causal connection exists between Defendant Kerr's role as a supervisor and Mr. Harvey's death as Defendant Kerr's custom or policy resulted in the deliberate indifference to Mr. Harvey's constitutional rights.

434. Defendant Michael Kerr failed to make sure that Mr. Harvey was under video surveillance once he observed that Defendant Leuschner had left the police headquarters building.

435. Defendant Kerr admitted that he assumed that as a "seasoned detective," Defendant Leuschner would have complied with policies of the police department relating to direct visual observation of Mr. Harvey, the actuation of the video surveillance system in the interview room, and having an independent investigator monitor the video surveillance system (Kerr Depo at 66:14 – 21; 70:16 – 71:23).

436. Defendant Kerr admitted that he assumed Defendant Leuschner's compliance with these policies and procedures, rather than supervising Defendant Leuschner's compliance with these policies and procedures.

437. It was Defendant Kerr's opinion that he should not have been required to inquire of Defendant Leuschner whether she was complying with these policies and procedures (Kerr Depo at 71:7 – 72:12).

438. Savannah Police Department General Order # ADM-002 is titled "Organization and Direction." Subpart IV(A) of this General Order is titled "Supervisory Responsibility" and states: "The responsibility of a supervisor is to account for employees under their supervision and to ensure that tasks are performed correctly and efficiently. A supervisor will be held responsible for issuing proper orders." Defendant Kerr failed to comply with this responsibility.

439. On April 2-3, 2021, it was Defendant Kerr's responsibility as a supervisor to account for Defendant Leuschner as an officer under his supervision to ensure that tasks were performed correctly and efficiently.

440. These tasks included ensuring that Defendant Leuschner maintained direct and continuous visual observation of Mr. Harvey, that Defendant Leuschner made certain that the remote video surveillance system was actuated, and that

Defendant Leuschner made certain that an investigator monitored the interview room on the video surveillance system.

441. It would have been Defendant Kerr's responsibility to ensure that an investigator was monitoring the video surveillance (Gavin Depo at 45:6 – 46:2).

442. Defendant Kerr failed to make sure that the video surveillance was being monitored.

443. Defendant Kerr agrees that had the video surveillance system in the interview room have been activated, as required, that Mr. Harvey might not have died on April 3, 2021 (Kerr Depo at 53:19 – 54:2; 54:8-11)

444. Defendant Kerr also failed to make sure that Mr. Harvey was not left alone after he observed Defendant Leuschner leave the police headquarters building.

445. As a supervisor it would have been Defendant Kerr's responsibility to inquire of Defendant Leuschner after she informed him that she was leaving the headquarters building whether there was direct visual observation of Mr. Harvey at all times while Mr. Harvey was in the interview room.

446. As a supervisor it was Defendant Kerr's responsibility, after Defendant Leuschner advised him that she was leaving the headquarters building, to

make sure that there was direct visual observation of Mr. Harvey at all times while the latter was in the interview room (Gavin Depo at 44:9-18).

447. As a supervisor it was Defendant Kerr's responsibility, after Defendant Leuschner advised him that she was leaving the headquarters building, to make sure that the interview room door was open or that Officer Greene or Officer White was inside the interview room with Mr. Harvey (Gavin Depo at 44:9-18).

448. As a supervisor it would have been Defendant Kerr's responsibility to ensure that there was video monitoring by an investigator of Mr. Harvey, at all times. while the latter was in the interview room (Gavin Depo at 45:9 – 46:2).

449. As a supervisor it would have been Defendant Kerr's responsibility to ensure that Defendant Leuschner had the video surveillance system actuated.

450. As a supervisor it would have been Defendant Kerr's responsibility to ensure that an investigator was monitoring the video surveillance system feed into the interview room.

451. These were supervisory failures by Defendant Kerr that directly caused or contributed to the violation of Mr. Harvey's constitutional rights and to Mr. Harvey's injuries, death, and damages.

452. Defendant Kerr agrees that if an investigator had been monitoring the video system, as was required, that Mr. Harvey might not have died by suicide on April 3, 2021 (Kerr Depo at 54:8-11).

<u>DEFENDANT MINTER</u>

453. Where the Defendant officer is not adequately trained to recognize when a detainee or arrestee is experiencing a mental health condition or crisis that creates a risk of a strong likelihood of the detainee/arrestee inflicting serious self-harm, it is incumbent on Defendant City of Savannah to adequately train its officers with some supervisory authority, concerning rules that require such detainee/arrestee to be the subject of constant video surveillance monitoring while in a City of Savannah Police Department interview room.

454. Where the Defendant supervisory officer is not adequately trained to recognize when a detainee or arrestee is experiencing a mental health condition or crisis that creates a risk of a strong likelihood of the detainee/arrestee inflicting serious self-harm, it is incumbent on Defendant City of Savannah to require its officers with some supervisory authority, to enforce rules that require such detainee/arrestee to be the subject of constant video surveillance monitoring while in a City of Savannah Police Department interview room.

455. Defendant Kerr, as a supervisor, directly participated in the unconstitutional conduct by not protecting Mr. Harvey from inflicting serious self-harm, including suicide.

456. Defendant Kerr, as a supervisor, directly participated in the unconstitutional conduct by not making sure that those under his authority protected Mr. Harvey from inflicting serious self-harm, including suicide.

457. An undeniable causal connection exists between Defendant Kerr's role as a supervisor and Mr. Harvey's death, as Defendant Kerr's conduct constituted deliberate indifference to Mr. Harvey's constitutional rights.

458. Defendant Minter knew, based on past practices that detectives and officers conducting interviews of suspects at Police Headquarters: a) routinely left detainees alone in interview rooms; b) routinely failed to remove items from the interview room, such as shoestrings, that a detainee could use to harm himself/herself; routinely failed to activate the video surveillance system; c) routinely failed to make sure an investigator was monitoring the video surveillance feed into the interview rooms; and d) routinely lacked adequate training to determine whether a detainee posed a suicide risk or posed a strong risk of serious self-harm.

459. These customs, practices, and policies, which amounted to constitutional violations, were the moving force behind and caused or contributed to Mr. William Harvey's death.

## DEFENDANT KERR'S ASSESSMENT OF DEFENDANT LEUSCHNER'S ACTIONS

460. Defendant Kerr agrees that Defendant Leuschner had supervisory responsibility over Officers Greene and White on April 2, 2021 (Kerr Depo at 46:9-17).

461. Defendant Kerr agrees that based on what Mr. Harvey told Defendant Leuschner about his mental condition it would have been inappropriate to leave him alone in a closed-door interview room (Kerr Depo at 37:6-11).

462. Defendant Kerr agrees that Defendant Leuschner should have told Officers Greene and White to open the door so that they could directly and continuously observe Mr. Harvey (Kerr Depo at 39:24 – 40:3).

463. Defendant Kerr failed to adequately supervise Defendant Leuschner in the above particulars.

464. Defendant Kerr was ultimately demoted from Sergeant to Corporal for his failure to adequately supervise Defendant Leuschner with respect to Mr. Harvey's detention and death.

## 30(b)(6) CORPORATE REPRESENTATIVE GAVIN'S ASSESSMENT OF KERR'S, LEUSCHNER'S, AND WHITE'S ACTIONS

465. Chief Gavin testified that Defendant Kerr, Defendant Leuschner and Defendant White failed in their employee responsibility to Mr. Harvey (Gavin Depo at 30:1-17).

466. Chief Gavin testified that Defendant Kerr failed in his supervisory responsibility with respect to Mr. Harvey (Gavin Depo at 30:18 – 31:2).

467. Defendant Kerr should have remained on the scene to assist Defendant Leuschner and should have exercised overall supervisory authority over Mr. Harvey's detention (Gavin Depo at 40:20 – 41:3).

468. Knowing that Defendant Leuschner was leaving the police headquarters building, Defendant Kerr should have placed Defendant White or Officer Greene inside the interview room with Mr. Harvey, or alternatively, he should have opened the door so that there could be direct visual observation of Mr. Harvey (Gavin Depo at 44:9 – 45:5).

469. Defendant Kerr could have determined in real time on April 2-3, 2021, whether Defendant Leuschner had activated the video surveillance system, known as Ocularis (Gavin Depo at 62:7-11).

470. Chief Gavin testified that Defendant Leuschner failed in her employee responsibility with respect to Mr. Harvey.

471. Defendant Leuschner should have left open the door to the interview room (Gavin Depo at 31:3-15).

472. Defendant Leuschner should have had someone in the interview room with Mr. Harvey if she was going to leave the interview room door closed (Gavin Depo at 31:16-24).

473. Defendant Leuschner should have had an investigator monitor, through the video surveillance system, the interview room where Mr. Harvey was being interviewed (Gavin Depo at 34:17 – 35:5).

474. Defendant Leuschner should have provided, but failed to provide, Defendant White and Officer Greene with specific instructions about what to do to protect Mr. Harvey while he was alone in the interview room (Gavin Depo at 32:16-19; 37:11-17).

475. It was important for Defendant Leuschner to provide specific instructions to Defendant White and Officer Greene as there was no written policy telling them what to do if the interviewing officer left the interview room, leaving the detainee alone in the interview room (Gavin Depo at 35:7-15).

476. Defendant Leuschner did not but should have informed Defendant White and Officer Greene that Mr. Harvy told her that he suffered from schizophrenia, had bipolar disorder, and suffered from depression (Gavin Depo at 74:14-20).

477. There was no City of Savannah Police Department policy or procedure in effect on April 2-3, 2021, that required Defendant Leuschner to inform Defendant White or Officer Greene that Mr. Harvey told her that he suffered from schizophrenia, had bipolar disorder, and suffered from depression (Gavin Depo at 76:15 – 77:1).

478. There was no City of Savannah Police Department policy or procedure in effect on April 2-3, 2021 that required Defendant Leuschner to inform Defendant White or Officer Greene that Mr. Harvey was crying, was "emotional as hell," banged his head on the table, and said more than once that he'd rather die than go to jail (Gavin Depo at 78:10-21).

479. Defendant White failed in his responsibility by not opening the door and either remaining inside with Mr. Harvey or engaging in direct, continuous visual observation of him (Gavin Depo at 41:4-9).

480. Mr. Harvey's death was preventable (Gavin Depo at 60:2-6).

481. Defendant Leuschner has supervisory liability for Mr. Harvey's death as she adhered to the custom or practice of the City of Savannah's Police Department that did not require her to make sure that those officers under her charge complied with the written policies and procedures then in effect regarding the protection of detainees in the Police Department's interview room.

482. Defendant Leuschner has supervisory liability for Mr. Harvey's death as she adhered to the custom or practice of the City of Savannah's Police Department that did not require her to make sure that there was direct visual observation of Mr. Harvey at all times while Mr. Harvey was in the interview room.

483. Defendant Leuschner has supervisory liability for Mr. Harvey's death as she adhered to the custom or practice of the City of Savannah's Police Department that did not require her to inform others responsible for Mr. Harvey's safety of the disclosures Mr. Harvey made to her about his mental health condition.

484. Defendant Leuschner has supervisory liability for Mr. Harvey's death as she adhered to the custom or practice of the City of Savannah's Police Department that did not require her to inform others responsible for Mr. Harvey's safety of the disclosures Mr. Harvey made concerning his intention to harm himself or be exposed to harm by others to avoid being jailed.

485. Defendant Kerr has supervisory liability for Mr. Harvey's death as he adhered to the custom or practice of the City of Savannah's Police Department that did not require her to make sure that those officers under his charge complied with the written policies and procedures then in effect regarding the protection of detainees in the Police Department's interview room.

486. Defendant Kerr has supervisory liability for Mr. Harvey's death as he adhered to the custom or practice of the City of Savannah's Police Department that did not require him to make sure that Defendant Leuschner complied with the written policies and procedures then in effect regarding the protection of detainees in the Police Department's interview room.

487. Defendant Kerr has supervisory liability for Mr. Harvey's death as he adhered to the custom or practice of the City of Savannah's Police Department that did not require him to make sure that there was direct visual observation of Mr. Harvey at all times while Mr. Harvey was in the interview room.

488. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Leuschner to comply with the written policies and procedures then in effect regarding the protection of detainees, like Mr. Harvey, while in the Police Department's interview room.

489. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Kerr to make sure that Defendant Leuschner complied with the written policies and

procedures then in effect regarding the protection of detainees, like Mr. Harvey, while in the Police Department's interview room.

490. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Leuschner to make sure that those under her charge complied with the written policies and procedures then in effect regarding the protection of detainees, like Mr. Harvey, while in the Police Department's interview room.

491. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Kerr to make sure that those under his charge complied with the written policies and procedures then in effect regarding the protection of detainees, like Mr. Harvey, while in the Police Department's interview room.

492. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Leuschner to make sure that there was direct visual observation of Mr. Harvey at all times while he was in the interview room.

493. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Kerr to make sure that there was direct visual observation of Mr. Harvey at all times while he was in the interview room.

494. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Leuschner to inform those responsible for Mr. Harvey's safety of the disclosures Mr. Harvey made to her about his mental health condition.

495. Defendant Minter, as the final policy-maker for Defendant City of Savannah's Police Department, has supervisory liability for Mr. Harvey's death as it was the custom or practice he allowed that did not require Defendant Leuschner to inform those responsible for Mr. Harvey's safety of the disclosures Mr. Harvey made concerning his intention to harm himself or be exposed to harm by others to avoid being jailed.

496. For the above-stated acts of supervisory conduct attributed to the final policymaker, Defendant City of Savannah has legal liability for Mr. William Zackary Harvey's injuries, death, and damages.

497. Mr. Harvey's injuries, death, and damages were caused by the supervisory failures of Defendants Leuschner and Kerr.

498. Mr. Harvey's injuries, death, and damages were caused by the supervisory failures of Defendant Minter.

499. Mr. Harvey's injuries, death, and damages were caused by the customs and practices of Defendant City of Savannah's Police Department for which Defendant Minter served, at all times relevant herein, as the final policymaker on law enforcement matters for Defendant City of Savannah.

<u>NO POLICY THAT DEFINES WHAT BEHAVIOR WOULD INDICATE A SUICIDE RISK</u>

500. There was no City of Savannah Police Department policy or procedure in effect on April 2-3, 2021, informing a City of Savannah police officer of what type of behavior by a detainee would put that officer on notice that the detainee would be a suicide risk (Gavin Depo at 83:23 – 84:9).

501. The absence of any such policy would have required each officer, no matter that officer's level of experience or inexperience, to make an individual determination of what behavior indicated a strong likelihood that a detainee might be at risk for serious self-harm.

502. The absence of a written policy and no policy established by custom or practice amounted to no policy.

## DEFENDANT MINTER AND THE CITY OF SAVANNAH

503. Defendant Minter, as Chief of Police, was aware at all times relevant herein that the officers under his authority frequently encountered detainees/arrestees with serious mental health conditions that put them at serious risk for engaging in acts of self-harm, if adequate constitutional safeguards, which are the subject of adequate training and meaningful enforcement, were not put in place.

504. Defendants Leuschner and Kerr, who were both clothed with some degree of supervisory authority, did not act alone in their deliberate indifference. They were aided and abetted by Defendant Minter, as a supervisory representative of Defendant City of Savannah, who failed in his role as Chief of Police: a) to make sure that officers who interacted with detainees/arrestees during interviews were adequately trained in recognizing signs of mental conditions that suggested a strong likelihood that such detainee/arrestee might pose a serious risk of self-harm, including suicide; b) to adequately train concerning and enforce policies that would prohibit detainees/arrestees from being left alone in interview rooms; c) to adequately train concerning and enforce

policies that would require the surveillance camera system to be operational at all times during a detainee/arrestee's interview room interview; d) to adequately train concerning and enforce policies that would require an investigator to monitor the surveillance camera system while a detainee/arrestee was in the interview room, particularly when a detainee/arrestee was left alone; e) to adequately train concerning and enforce policies that would require officers left outside an interview room to visually monitor the inside of the room when if the interviewing detective left a detainee/arrestee alone in an interview room; f) to adequately train concerning and enforce policies that would require officers to remove objects or items a detainee/arrestee left alone in a closed interview room, might use for self-harm, including suicide; g) to adequately train concerning and enforce policies that would require officials with some supervisory authority to adhere to and enforce policies relating to protecting detainees/arrestees from serious self-harm; and h) to engage in meaningful investigations and impose meaningful discipline on those who violate policies designed, in part, to recognize and prevent those with mental conditions that might put them at serious risk of self-harm from engaging in such conduct.  On April 3, 2021, these failures

constituted the official policy of Defendant City of Savannah and its Police Department.

505. Defendant Leuschner admitted that she had no specific recollection of having any police training in recognizing mental illness or in assessing suicide risk.

506. Defendant White admitted that he had no police training in recognizing mental illness or in assessing suicide risk.

507. Officer Greene admitted that he had no police training in recognizing mental illness or in assessing suicide risk.

508. The Defendants' collective failures constituted a pyramid of supervisory and policy failures.

509. Defendant Leuschner failed to adequately supervise Defendant White and Officer Greene and provide them with specific instructions about how to safeguard Mr. Harvey while he was alone in the closed-door interview room, rather than merely assuming they would comply with certain policies and procedures.

510. On April 2-3, 2021, Defendant Leuschner's assumption of policy compliance, as set forth above, of those over whom she had supervisory authority (including Defendant White and Officer Greene) was the official policy she followed and was the official policy of the City of Savannah.

511. Defendant Kerr failed to adequately supervise Defendant Leuschner and ensure that she was complying with and causing those under her watch to comply with policies and procedures designed to protect Mr. Harvey, rather than merely assuming such compliance.

512. On April 2-3, 2021, Defendant Kerr's assumption of policy compliance, as set forth above, of those over whom he had supervisory authority (including Defendant Leuschner) was the official policy he followed and was the official policy of the City of Savannah.

513. Defendant Minter failed to adequately supervise Defendant Kerr and ensure that he was actually supervising employees such as Defendant Leuschner and making sure that he was complying with and causing those under his watch to comply with policies and procedures designed to protect Mr. Harvey, rather than merely assuming such compliance.

514. On April 2-3, 2021, Defendant Minter's assumption of policy compliance, as set forth above, of those over whom he had supervisory authority (including Defendant Kerr) was the official and policy he followed and was the official policy of the City of Savannah.

515. The above-cited practices, policies, and customs amounted to violations of Mr. William Harvey's constitutional rights that were the moving force and a direct and proximate cause of Mr. Harvey's injuries, death, and damages

## Count IV

## Violation of the Americans With Disabilities Act of 1990 for Failure to Make Reasonable Modifications to Policies, Practices, and Procedures

516. At all relevant times, the City of Savannah was a public entity subject to the requirements of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117 ("ADA").

517. At the time of the incident-in-suit, Mr. William Harvey was a qualified individual with a disability within the meaning of the ADA.

518. While an in-custody individual who was handcuffed and without any weapon on his person, Mr. William Harvey did not pose a "direct threat" within the meaning of the ADA and its implementing regulations, because any risk presented by his behavior could have been mitigated by means of reasonable accommodations.

519. At all relevant times, Defendant City of Savannah takes citizens into Custody.

520. Defendant City of Savannah arrest and detains hundreds of individuals each year in its Police Headquarters, and at all times relevant herein, was aware

that a significant number of these individuals suffer from some form of mental illness.

521. Upon information and belief, many of those persons are arrested or detained at the City of Savannah's Police Headquarters after being arrested by a City of Savannah police officer.

522. Defendant City of Savannah was well aware long before April 2021 that its police officers would have to arrest and detain hundreds of citizens annually who were experiencing some form of mental illness.

523. City of Savannah policymakers, including, but not limited to the City Council, the Mayor, and the Chief of Police, have long known that its City's Police Department did not provide its police officers adequate training and resources to recognize and accommodate persons experiencing mental health crises in the course of performing an arrest and/or interrogation. Defendant City of Savannah was deliberately indifferent to that unmet need.

524. By failing to provide officers with adequate training and resources to recognize and accommodate arrestees experiencing mental health crises when performing a custodial arrest, Defendant City of Savannah failed to make reasonable modifications to its policies, practices, and procedures that were

necessary to avoid exposing persons with mental illness to an undue and disproportionate risk of bodily harm or death by reason of their disability.

525. Defendant City of Savannah, through its policymakers, had actual knowledge of the need for such reasonable modifications to its policies, practices, and procedures, but deliberately ignored that unmet need.

526. As a result of Defendant City of Savannah's deliberate refusal to make reasonable modifications to its policies, practices, and procedures, arrestees with mental illness, including William Zackary Harvey, were exposed to a heightened risk of injury or death relative to other arrestees, by reason of their disability.

527. Because Defendant Leuschner was not adequately trained in how to recognize and accommodate arrestees experiencing mental health crises, she was concerned only with whether Mr. Harvey could answer her questions.

528. At all relevant times, Defendant City of Savannah knew that it had placed Defendants Leuschner, Kerr, and White in positions of authority that would require them to recognize and accommodate arrestees experiencing mental health crises and possibly command other officers in such situations.

529. Because Defendant City of Savannah failed to provide Defendants Leuschner, Kerr, and White with adequate training their poor decisions foreseeably caused the death of William Zackary Harvey.

530. Besides failing to provide adequate training, Defendant City of Savannah also failed to adopt policies, practices, and procedures to provide adequate guidance and support to an officer not trained to recognize and accommodate an arrestee experiencing a mental health crisis.

531. Defendant City of Savannah, through the Defendant officers, had information that William Harvey was experiencing a mental health crisis and might engage in serious acts of self-harm, but Defendant City of Savannah did not have policies, practices, or procedures that it routinely enforced to recognize and protect arrestees who clearly demonstrated mental health issues or threatened serious self-harm or demonstrated a propensity to engage in serious self-harm.

532. Providing its officers with adequate training and resources to recognize and accommodate persons experiencing mental health crises during arrests would not fundamentally alter the activities of the Defendant City of Savannah's Police Department.

533. Providing its officers with adequate training and resources to recognize and accommodate mental health crises during arrests would not impose an undue cost or burden on Defendant City of Savannah.

534. Providing its officers with adequate training and resources to recognize and accommodate mental health crises during arrests would not place Defendant City of Savannah's officers at added risk, but instead would make them safer.

535. As a foreseeable result of Defendant City of Savannah's deliberate indifference to the need for reasonable modifications to its policies, practices, and procedures as described above, William Zackary Harvey suffered personal injury, pain and suffering, and death.

536. Defendant City of Savannah is liable to Plaintiffs for compensatory damages resulting from its deliberate indifference and that of the individual defendants, to include damages for personal injuries, pain and suffering, and wrongful death.

## Count V

### Violation of the Americans With Disabilities Act of 1990
### Failure to Provide Reasonable Accommodations

537. The ADA requires a public entity to make reasonable accommodations for a qualified individual's known disability.

538. At the time of the incident-in-suit, Mr. William Harvey was a qualified individual with a disability within the meaning of the ADA.

539. At all relevant times, the individual Defendants acted in the course and scope of their official duties as agents and employees of Defendant City of Savannah.

540. While an in-custody arrestee who was handcuffed and without any weapon on his person, Mr. William Harvey did not pose a "direct threat" within the meaning of the ADA and its implementing regulations, because any risk presented by his behavior could have been mitigated by means of reasonable accommodations.

541. Once Mr. Harvey was in custody and handcuffed, he did not pose a "direct threat" within the meaning of the ADA and its implementing regulations.

542. At all relevant times, Defendant City of Savannah operated its own Police Department.

543. Defendant Chief Minter was at all times relevant herein, responsible for overseeing the City of Savannah's Police Department and to ensure that arrestees brought to police headquarters to be interviewed were protected from inflicting serious self-harm, including suicide.

544. The Chief of Police acts as an arm of the City of Savannah insofar as he sets policy and oversees practices which relate to protecting arrestees brought to police headquarters to be interviewed, from inflicting serious self-harm, including suicide.

545. As detailed in the factual allegations above, the officers involved in Mr. Harvey's encounter at Savannah's Police headquarters acted with discriminatory animus resulting from the fact that Mr. Harvey demonstrated impulses to inflict serious self-harm, including suicide.

546. Specifically, these individuals acted with discriminatory animus by placing Mr. Harvey in a circumstance where he was not protected from his suicidal impulses.

547. To whatever extent Mr. Harvey was a person with suicidal impulses, he should have been provided accommodations to protect him from himself, and such accommodations could have been provided without constituting a substantial alteration in the services provided by the City of Savannah's Police Department. For example, Mr. Harvey could have been monitored by an investigator on the Police Department's video surveillance camera system or he could have had someone placed in the interview room with him, both of

which were already required by policies of the City of Savannah's Police Department.

548. Mr. Harvey should have been provided with monitoring and accompaniment in the interview room but was denied these opportunities at Police Department headquarters.

549. Those individuals who decided Mr. Harvey's interview room conditions acted with discriminatory animus because of his race, mental health challenges, and perceived modest financial status. Their decisions were based upon negative associations, biases, and prejudices against individuals such as Mr. Harvey.

550. At all relevant times Defendants Leuschner, Kerr, and White were aware that Mr. William Harvey was experiencing a disabling mental health crisis.

551. Mr. William Harvey's words and behavior made it apparent to Defendants Leuschner, Kerr, and White that he was experiencing a disabling mental health crisis.

552. Defendant Leuschner also knew that she did not have the requisite specialized training to recognize and accommodate Mr. Harvey's mental health crisis.

553. Because Defendant Leuschner did not have adequate training to accommodate a mental health crisis, and because she knew that Mr. Harvey was experiencing a mental health crisis, Defendant Leuschner should have made

certain that the interview room's camera surveillance system was operational and in operation, that the interview room was being monitored by another investigator, that Mr. Harvey was never left alone, and or that the officers outside the interview room had visual access to Mr. Harvey at all times.

554. Accommodating Mr. Harvey in the ways cited in the preceding paragraph would have done nothing more than the rules and regulations of Defendant City of Savannah's Police Department, then in existence, already required.

555. Had Defendants Leuschner, Kerr, and White followed Police Department rules and regulations, they would have been required to make certain that the interview room's camera surveillance system was operational and in operation, that the interview room was being monitored through the camera surveillance system by another investigator, that Mr. Harvey was never left alone, or that the officers outside the interview room had visual access to Mr. Harvey at all times.

556. Notwithstanding, Defendants Leuschner, Kerr, and White failed and/or refused to make any of these accommodations.

557. Instead, Defendant City of Savannah's officers did the opposite: a) they failed to make sure the camera surveillance system was operational and in-operation; b) they failed to make sure that the interview room was monitored

through the camera surveillance system by an investigator; c) they failed to make sure Mr. Harvey was never left alone; and d) failed to make sure that the two officers outside the door to the interview room had visual access to Mr. Harvey at all times.

558. By failing and refusing to make these reasonable accommodations, Defendant City of Savannah's officers made a man already experiencing a mental health crisis even less safe.

559. As a foreseeable result of the Defendants' deliberate indifference to the need for reasonable accommodations, Mr. William Harvey suffered personal injury, pain and suffering, and death.

560. Defendant City of Savannah is vicariously liable for its Defendant Officers' failure to make reasonable accommodations for Mr. Harvey's disability, because they acted under Defendant City of Savannah's authority, on the City's behalf, and pursuant to the City's policies.

561. Defendant City of Savannah is liable for the failure of its Defendant Officers to make reasonable accommodations for Mr. Harvey as it has openly acknowledged through its Police Chief and Mayor that its officers were responsible for and/or could have prevented Mr. Harvey's death.

562. Defendant City of Savannah is liable for its Defendant Officers' failures to make reasonable accommodations because their conduct was a foreseeable result of Defendant City of Savannah's failure to make modifications to its own policies, practices, and procedures as alleged in Count IV, above.

563. Defendant City of Savannah is liable to the Plaintiffs for compensatory damages resulting from its deliberate indifference and that of its Defendant Officers, to include damages for personal injuries, pain and suffering, and wrongful death.

564. Defendant City of Savannah was aware long before April 2021 that its police officers would have arrest and interview encounters with hundreds of citizens annually who were experiencing some form of mental illness.

565. City of Savannah policymakers, including, but not limited to the City Council, the Mayor, and the Chief of Police, have long known that its City's Police Department did not provide its police officers adequate training and resources to recognize and accommodate persons experiencing mental health crises in the course of performing an arrest and/or interrogation. Defendant City of Savannah was deliberately indifferent to that unmet need.

566. By failing to provide officers with adequate training and resources to recognize and accommodate arrestees experiencing mental health crises when

performing a custodial arrest, Defendant failed to make reasonable modifications to its policies, practices, and procedures that were necessary to avoid exposing persons with mental illness to an undue and disproportionate risk of bodily harm or death by reason of their disability.

567. Defendant City of Savannah, through its policymakers, had actual knowledge of the need for such reasonable modifications to its policies, practices, and procedures, but deliberately ignored that unmet need.

568. As a result of Defendant City of Savannah's deliberate refusal to make reasonable modifications to its policies, practices, and procedures, arrestees with mental illness, including William Zackary Harvey, were exposed to a heightened risk of injury or death relative to other arrestees, by reason of their disability.

569. Because Defendant Leuschner was not adequately trained in how to recognize and accommodate arrestees experiencing a mental health crises, she was concerned only with whether Mr. Harvey could answer her questions.

570. At all relevant times, Defendant City of Savannah knew that it had placed Defendants Leuschner, Kerr, and White in positions of authority that would require them to recognize and accommodate arrestees experiencing mental health crises and possibly command other officers in such situations.

571. Defendant City of Savannah did not provide Defendants Leuschner, Kerr, and White with adequate training to recognize and accommodate arrestees experiencing mental health crises.

572. Because Defendant City of Savannah failed to provide Defendants Leuschner, Kerr, and White with adequate training their poor decisions foreseeably caused the death of William Zackary Harvey.

573. Besides failing to provide adequate training, Defendant City of Savannah also failed to adopt policies, practices, and procedures to provide adequate guidance and support to an officer not trained to recognize and accommodate an arrestee experiencing a mental health crisis.

574. Providing its officers with adequate training and resources to recognize and accommodate persons experiencing mental health crises during arrests would not fundamentally alter the activities of the Defendant City of Savannah's Police Department.

575. Providing its officers with adequate training and resources to recognize and accommodate mental health crises during arrests would not impose an undue cost or burden on Defendant City of Savannah.

576. Providing its officers with adequate training and resources to recognize and accommodate mental health crises during arrests would not place Defendant City of Savannah's officers at added risk, but instead would make them safer.

577. As a foreseeable result of Defendant City of Savannah's deliberate indifference to the need for reasonable modifications to its policies, practices, and procedures as described above, William Zackary Harvey suffered personal injury, pain and suffering, and death.

578. Defendant City of Savannah is liable to Plaintiffs for compensatory damages resulting from its deliberate indifference and that of the individual defendants, to include damages for personal injuries, pain and suffering, and wrongful death.

## Count VI

## Violations of Section 504 of the Rehabilitation Act of 1973

579. At all relevant times, Defendant City of Savannah was a recipient of federal funds and was subject to the requirements of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

580. At the time of the incident in suit, Mr. William Harvey was a qualified individual with a disability within the meaning of the Rehabilitation Act.

581. The facts alleged in Counts IV and V above are incorporated into this Count as if fully alleged herein.

582. Defendant City of Savannah is liable to the Plaintiffs for compensatory damages resulting from its deliberate indifference and that of the individual Defendants, to include damages for personal injuries, pain and suffering, and wrongful death.

## Count VII

## Punitive Damages

583. The Defendants in their individual capacities have acted with willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

584. Punitive damages should be awarded, not to compensate the Plaintiffs, but to punish, penalize, or deter the Defendants named in their individual capacities.

585. Plaintiffs are entitled to the recovery of punitive damages against the Defendants named in their individual capacities.

## Count VIII
## Attorney's Fees Against All Defendants

586. Plaintiffs seek attorney's fees under 42 U.S.C. § 1988(b) for their causes of action under 42 U.S.C. § 1983.

587. Because of Defendant City of Savannah's violations of Mr. William Harvey's rights under the ADA, Plaintiffs are entitled to an award of costs and reasonable attorneys' fees under 42 U.S.C. § 12205.

588. Because of Defendant City of Savannah's violations of Mr. William Harvey's rights under the Rehabilitation Act, Plaintiffs are entitled to an award of costs and reasonable attorneys' fees under 29 U.S.C. § 794a.

## REQUEST FOR RELIEF

WHEREFORE, on the basis of the foregoing, Plaintiffs respectfully pray that this Court:

a) Assume jurisdiction over this action;

b) Hold a trial by jury on all issues so triable;

c) Award general, nominal, and special damages, including funeral and burial expenses, to Mr. Harvey's Estate for damages incurred before his death in an amount to be determined by the jury;

d) Award general, nominal, and special damages to Mr. Michael Harvey for the value of Mr. William Harvey's life in an amount to be determined by the jury;

e) Award punitive damages against each Defendant sued in his/her individual capacity;

f) Award reasonable attorney's fees, expenses, and costs of litigation;

g) Award such other and further relief to which the Plaintiffs are legally entitled, whether explicitly pleaded or not, and as this Court deems just and equitable.

Respectfully submitted this 13th day of February, 2024.

/s/ *Harold W. Spence*
HAROLD W. SPENCE
Georgia Bar No. 671150
FRANCYS JOHNSON
Georgia Bar No. 667352
MAWULI M. DAVIS
Georgia Bar No. 212029
*Attorneys for Plaintiffs*

**DAVIS BOZEMAN LAW**
4153 C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
P: 404.244.2004
F: 404.244.2020
E: hspence@davisbozemanlaw.com
E: mdavis@davisbozemanlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

THE ESTATE OF WILLIAM ZACKARY   *
HARVEY, SHIRLEY FRANCIS, as       *
Mother of William Zackary Harvey, and   *
Michael Harvey, as surviving son of     *
William Zackary Harvey,             *
                             *

       Plaintiffs,            * Civil Action No.: 4:23-cv-00064

v.                            ***Jury Trial Demanded***

Former POLICE CHIEF ROY W.     *
MINTER, in his individual capacity,    *
SAVANNAH, GEORGIA,          *
a Municipal Corporation of         *
the State of Georgia, SILVER      *
LEUSCHNER, individually, MICHAEL   *
KERR, individually, and MATTHEW    *
WHITE, individually,           *

       Defendants.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 13th day of February, 2024, served the Defendants' counsel in the foregoing matter with a copy of the **SECOND AMENDED COMPLAINT FOR DAMAGES** by CM/ECF a true and correct copy of the same addressed as follows:

Taylor L. Dove, Esq.
Bradley M. Harmon, Esq.
Hunter, Maclean, Exley & Dunn, P.C.
P.O. Box 9848
Savannah, Georgia 31412
E: tdove@huntermaclean.com
E: bharmon@huntermaclean.com
*Attorneys for Defendants*


R. Bates Lovett, Esq.
Jennifer N. Herman, Esq.
Office of the City Attorney
P.O. Box 1027
Savannah, Georgia 31402
E: blovett@savannahga.gov
E: jherman@savannahga.gov
*Attorney for City of Savannah*


Respectfully submitted this 13th day of February, 2024.


/s/ Harold W. Spence
HAROLD W. SPENCE
Georgia Bar No. 671150
FRANCYS JOHNSON
Georgia Bar No. 667352
MAWULI M. DAVIS
Georgia Bar No. 212029
*Attorneys for Plaintiffs*

**DAVIS BOZEMAN LAW**
4153 C Flat Shoals Parkway, Suite 332
Decatur, Georgia 30034
P: 404.244.2004
F: 404.244.2020
E: hspence@davisbozemanlaw.com
E: mdavis@davisbozemanlaw.com

114