## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

THE ESTATE OF WILLIAM ZACKARY
HARVEY; SHIRLEY FRANCIS, as Mother of
William Zackary Harvey; and MICHAEL
HARVEY, as surviving son of William Zackary
Harvey,

         Plaintiffs,

    v.

ROY W. MINTER, former Chief of Police for
the City of Savannah, Georgia, in his
individual capacity; the CITY OF
SAVANNAH, GEORGIA, a Municipal
Corporation of the State of Georgia; SILVER
LEUSCHNER, in his individual capacity;
MICHAEL KERR, in his individual capacity;
and MATTHEW WHITE, in his individual
capacity,

        Defendants.

CIVIL ACTION NO.: 4:23-cv-00064

### O R D E R

This case arises from the April 2, 2021, suicide of William Zackary Harvey that occurred while in custody of the Savannah Police Department ("SPD"). (Doc. 67.) Harvey's mother, Shirley Francis, Harvey's son, Michael Harvey, and Harvey's estate sued the City of Savannah ("City") and various SPD officers involved in Harvey's detention alleging various violations of federal and state law. (Id.) Presently before the Court is Defendants' Motion for More Definite Statement and Partial Motion to Dismiss, in which Defendants argue that Plaintiffs' Second Amended Complaint ("SAC") constitutes an improper "shotgun pleading" and that some of Plaintiffs' claims against Defendants should be dismissed based on qualified immunity. (Docs.

70, 70-1.)  For the reasons below, the Court **GRANTS in Part and DENIES in Part** Defendants'

Motion and **DIRECTS** Plaintiffs to file a Third Amended Complaint following the parameters set

forth in the Conclusion of this Order.

## BACKGROUND

### I.    Factual Background

The following facts are set forth in the SAC.  (Doc. 67.)  On April 2, 2021, four SPD

officers, Matthew White, Rodheem Greene, Timothy Valmont, and Silver Leuschner, were

dispatched to a convenience store located at 2016 Skidaway Road, Savannah, Georgia, in

connection with a reported altercation.  (Id. at p. 5.)  There, the Officers arrested Harvey, and

Greene escorted Harvey to the SPD Headquarters.  (Id. at pp. 5–6.)  Harvey was taken to an

interview room for questioning.  (Id. at p. 6.)  Leuschner activated her body-worn camera

("bodycam") but did not turn on the camera in the interview room.  (Id.)  Leuschner explained that

she did not turn on the camera in the interview room because she had her bodycam activated.  (Id.)

Harvey was handcuffed during the interview, and Leuschner described him as mumbling

and emotional.  (Id. at p. 7.)  Harvey described himself as a paranoid schizophrenic with anxiety

who was "really depressed."  (Id.)  Harvey also advised Leuschner that he takes Zoloft for his

depression.  (Id.)  Leuschner responded, "Okay, but do any of those medical conditions keep you

from talking to me[?]"  (Id. at pp. 14–15.)  During the interview, Harvey was crying.  (Id. at p. 7.)

He stated that he would rather die than go to jail and that the police would have to kill him before

he would go back to jail.  (Id.)  Harvey also stated, "I'm not a violent person but I'll stand on

myself and kill myself."[1]  (Id.)  Leuschner observed Harvey bang his head on the table.  (Id. at p.

8.)

_____

[1]  The parties dispute whether this is an accurate statement of the words used by Harvey, and Plaintiffs
themselves have been a bit inconsistent with their allegation on this particular point.  This allegation was

Leuschner then left the interview room to go speak with her superior, Sergeant Michael Kerr, but advised Harvey she would return.  (<u>Id.</u> at p. 9.)  When she left the room, she turned off her bodycam.  (<u>Id.</u>)  When she returned, Leuschner watched Greene handcuff Harvey's left hand to a wall anchor, leaving the other hand unshackled to sign a waiver of rights form.  (<u>Id.</u>)  Leuschner then exited the interview room for a second time and told Greene and White—who were outside the room—to watch Harvey.  (<u>Id.</u> at pp. 9–10.)  Specifically, Leuschner said, "If you hear something, check on him."  (<u>Id.</u> at p. 10.)  Leuschner assumed they would open the door to maintain direct observation of Harvey, later noting that, "they're officers just like me, they're not stupid." (<u>Id.</u> at p. 71.)  Kerr knew that Leuschner left SPD headquarters, but he did not open the interview room door or place Greene or White in the room with Harvey.  (<u>Id.</u> at p. 84.)  About twenty to forty minutes after Leuschner left, White and Greene went in to check on Harvey because he had been so quiet.  (<u>Id.</u> at p. 10.)  When they opened the door to the interview room, they saw Harvey tipped over, unconscious, with a shoestring tied around his neck.  (<u>Id.</u> at pp. 10–11.)  Harvey's cause of death was suicide by hanging.  (<u>Id.</u> at p. 13.)  The toxicology report found that Harvey's blood tested positive for alcohol, Zoloft, and cocaine.  (<u>Id.</u> at pp. 13–14.)

---

contained in Plaintiffs' initial complaint, (doc. 1, p. 7), but it was omitted from Plaintiffs' First Amended Complaint, (<u>see generally</u> doc. 26).  In their Motion, Defendants contend this is a clear misstatement of the bodycam footage, where Harvey stated he would "stand on [him]self and *defend* [him]self."  (Doc. 70-1, p. 5.)  In the "Relevant Facts" section of Plaintiffs' Response, Plaintiffs asserted that Harvey said, "I'll stand on myself and [kill or defend] myself."  (Doc. 73, p. 4 (alterations in original).)  In the argument section of Plaintiffs' Response, however, Plaintiffs cited only to Harvey's statements that he would "rather die than go to jail" and that he's "not going back to jail, you all will have to kill" him, and never referenced any time Harvey threatened to kill himself.  (<u>Id.</u> at p. 11.)  Still, the Court is bound by the SAC's contents and must accept all facts in the complaint as true.  <u>See</u> <u>Gates v. Khokhar</u>, 884 F.3d 1290, 1296 (11th Cir. 2018) ("When ruling on a motion to dismiss, [the Court must] accept the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor.");  <u>Reed v. Royal Caribbean Cruises Ltd.</u>, 618 F. Supp. 3d 1346, 1354–55 (S.D. Fla. 2022) ("[W]hen considering a motion to dismiss a plaintiff's complaint, a court may not consider anything beyond the face of the complaint.") (internal quotations omitted).

SDP Chief Roy Minter stated in a press conference that the officers involved "made some poor decisions" and "didn't follow [SPD] policy and procedure." (Id. at p. 16.)  Minter added that in his thirty-five years in law enforcement, he had not experienced an in-custody death where someone was left unmonitored in an interview room. (Id. at p. 17.)  Following an investigation, Leuschner was terminated by a disciplinary review board for violating the following SPD policies: "a) criminal investigation policy; b) employee responsibility; c) oath of office ethics and conduct; and d) video/audio recording equipment." (Id. at p. 18.)  Kerr was also terminated by the disciplinary review board for violating supervisory responsibility, as it would have been his responsibility to ensure that the policies relevant to Harvey's detention were being followed, but his termination was later rescinded in favor of a demotion. (Id. at pp. 19, 43, 78–80.)  Lastly, White was suspended by the disciplinary review board for violating "a) employee responsibility; and b) oath of office ethics and conduct." (Id. at pp. 19–20.)

According to the SAC, during Harvey's detention, Leuschner, Kerr, and White committed violations of various SPD policies: SPD General Order #OPS-001 titled "Criminal Investigations," which provides that "[a]nother investigator will monitor the interview through the video surveillance system as a coach to the interviewer," (id. at p. 26); SPD General Order #OPS-010 titled "Video/Audio Recording Equipment," which provides that "[p]rior to using the interview room wherein events are to be recorded, the interviewing detective/officer shall ensure that the video cameras are working properly prior to starting the interview," (id. at p. 32); and SPD General Procedure #OPS-001, which provides that "[s]uspects or potential suspects will be kept under direct supervision and will not be left alone while in the interview room," (id. at p. 33).  Plaintiffs allege that these policies are intended, at least in part, to protect detainees. (Id. at p. 68.)

## II.     Procedural Background

Plaintiffs sued the City as well as Minter, Leuschner, Kerr, and White, in their individual capacities, in this Court on March 14, 2023.  (Doc. 1.)  Defendants moved to dismiss, (doc. 19), and Plaintiffs filed their First Amended Complaint, (doc. 26).  Defendants then filed a Partial Motion to Dismiss Plaintiffs' First Amended Complaint.  (Doc. 33.)  Rather than responding to the motion, Plaintiffs filed, without leave of court, an amended complaint that only purported to amend particular aspects of the First Amended Complaint.  (Doc. 52.)  The Court entered an Order striking that complaint from the record and directing Plaintiffs to file a comprehensive, standalone amended complaint "[t]o avoid any confusion about what claims are asserted against which [D]efendants."  (Doc. 66, p. 4.)  On February 13, 2024, Plaintiffs filed the at-issue SAC, which is 114 pages long and contains 588 enumerated paragraphs.  (Doc. 67.)

In the SAC, Plaintiffs bring a state law negligence claim against Leuschner and White (Count I); a "deliberate indifference" claim under 42 U.S.C. § 1983 ("Section 1983") against Leuschner and White (Count II); a supervisory liability claim under Section 1983 against Minter, Leuschner, and Kerr, and a Monell liability[2] claim under Section 1983 against Minter (Count III); claims for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112, et seq. ("ADA") against the City (Counts IV–V); a claim against the City for violating Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count VI); a punitive damages claim against all Defendants (Count VII); and a claim for attorneys' fees against all Defendants (Count VIII).  (Doc. 67, pp. 40–111.)  Defendants then filed the at-issue Motion for More Definite Statement and Partial Motion to Dismiss, (doc. 70), arguing that the SAC is a shotgun pleading and that Plaintiffs

---

[2] The "Monell doctrine" holds that a municipality can be liable under 42 U.S.C.S. § 1983.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

have failed to state a claim for relief under their Section 1983 in Counts II and III, (doc. 70-1, pp. 3–21).  Plaintiffs subsequently filed a Response.  (Doc. 73.)

## DISCUSSION

### I.   Defendants' Motion for More Definite Statement

Defendants first argue that the SAC is an impermissible "shotgun pleading" which must be re-pled.  (Doc. 70-1, pp. 7–9.)  "A district court has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading grounds."  Vibe Micro, Inc. v. Shabanets, 878 F.3d 1291, 1295 (11th Cir. 2018) (internal quotations omitted).  Shotgun pleadings are pleadings that violate either Federal Rule of Procedure 8(a)(2)[3] or 10(b).[4]  Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015).  The Eleventh Circuit Court of Appeals has identified "four rough types" of shotgun pleadings: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts;" (2) a complaint that contains "conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) a complaint that fails to "separat[e] into a different count each cause of action or claim for relief;" and (4) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  Id. at 1321–23.  "The unifying characteristic of all types of shotgun pleadings

---

[3]  Rule 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

[4]  Rule 10(b) requires a party to "state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.  A later pleading may refer by number to a paragraph in an earlier pleading.  If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count."  Fed. R. Civ. P. 10(b).

is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." Id. at 1323.

Defendants argue that the sheer length of the SAC, at 114 pages and 588 paragraphs, requires them "to undertake the onerous task of 'cull[ing] through the allegations, identify[ing] the claims, and, as to each claim identified, select[ing] the allegations that appear to be germane to the claim.'"  (Doc. 70-1, p. 7 (quoting Jones Creek Invs., LLC v. Columbia Cnty., No. 1:11-cv-174, 2011 WL 7446782, at *3 (S.D. Ga. Dec. 9, 2011), *report and recommendation adopted*, 2012 WL 694316 (S.D. Ga. Mar. 1, 2012)).  Defendants describe the SAC as "bulky [and] difficult to follow" and say it "contains many inconsistencies that make it difficult to respond to or evaluate a particular claim, more specifically the [Section] 1983 claims, against a particular Defendant without sorting through a mass of repetitive material and conclusory statements."  (Doc. 71, p. 8.)  Defendants also list more particularized grievances that most closely align with the previously identified shotgun pleading categories of (2) and (4).  (Id. at 8 ("Count III . . . jumps back and forth between allegations of wrongdoing by several Defendants making it impossible to follow and understand the bases of Plaintiff[s'] claims."); id. ("Counts IV and V do not make it clear what Defendant(s) purportedly violated the [ADA].") id. ("Count II . . . contains a number of . . . irrelevant allegations.").)  In response, Plaintiffs argue only that they made liberal use of titled headings to make the SAC easier to follow, and the "considerable detail" included in the SAC was intended to provide sufficient facts to support the Counts that were the subject of Defendants' prior Motion to Dismiss.  (Doc. 73, p. 7.)

While Defendants concede that Rule 8(a)(2) does not set a maximum length, they contend the length of a complaint can contribute to its unintelligibility.  (Doc. 70-1, p. 7.)  To be sure, the length of Plaintiffs' SAC gives the Court some pause.  Courts sometimes emphasize the unwieldly

length of shotgun pleadings as a contributing factor to the pleadings' unintelligibility.  See Jones Creek Invs., 2011 WL 7446782, at *4 (describing the length of the 174-page and 534-paragraph as "problematic"); United States v. Lockheed-Martin Corp., 328 F.3d 374, 376–78 (7th Cir. 2003) (describing pleading that "broke the scale at 109 pages containing 345 numbered paragraphs" and noting that "length and complexity may doom a complaint by obfuscating the claim's essence"). While length should be considered to the extent it prevents Defendants from receiving notice of the claims against them, "[l]ength alone does not define a shotgun pleading."  Smith v. Wayne Cnty., Georgia, No. 2:23-CV-27, 2023 WL 3741154, at *4 (S.D. Ga. May 31, 2023).

In any event, Defendants' more specific issues with the SAC are well-founded. Throughout Count III, which spans thirty-two pages and 146 paragraphs, the allegations jump back and forth amongst Defendants.  (Doc. 73, pp. 64–96.)  For example, in just five paragraphs—from Paragraph 484 to Paragraph 488—different allegations are made against three separate Defendants: Leuschner, Kerr, and Minter.  (Id. at pp. 87–88.)  This is the case even though each of those Defendants separately receives their own heading and accompanying allegations elsewhere in Count III of the SAC.  See, e.g., id. at pp. 69–74 (titled "Defendant Leuschner's Supervisory Liability"); id. at 74–81 (titled "Defendant Kerr's Supervisory Liability"); id. at pp. 81–83 (titled "Defendant Minter").  This organizational structure proves incredibly hard to follow, since Defendants must search outside their own headings for separate allegations against them, even within the same count.

The SAC includes many irrelevant allegations, including paragraphs that simply recite state pattern jury charges for civil cases, (id. at p. 45), as well as contradictory allegations, (see, e.g., id. at pp. 10, ("According to White, approximately 20-40 minutes expired after Det. Leuschner's second departure from the interview room, before he and Greene went inside to check on the

suspect;" "Defendant White showed deliberate indifference by not opening the door to the interview room until approximately forty-eight (48) minutes after Defendant Leuschner's departure")).

Further, the presence of repetitive allegations is staggering.  See, e.g., id. at pp. 71–72 ("Leuschner gave no instructions to the two officers she left outside the closed door of the interview room to maintain direct visual observation of Mr. Harvey" closely followed by "Leuschner never advised Officers Greene or White that they should maintain visual observation of Mr. Harvey"); id. at p. 62 ("Leuschner, Kerr, and White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by leaving him alone in the interview room without making sure that the video surveillance camera system in the room was operational" immediately followed by "Leuschner, Kerr, and White disregarded the strong likelihood of the risk of serious self-harm to Mr. Harvey by leaving him alone in the interview room without making sure that the video surveillance camera system in the room was operational and being actively monitored by another person"); id. at p. 68 ("[The City] has created and enforce[d] certain policies to comply with its constitutional obligations" immediately followed by "[The City] has developed, over time, certain policies to comply with its constitutional obligations to provide safety and protection to detainees" immediately followed by "Part of the purpose in enacting and enforcing certain policies is for the protection of the detainee while in the custody of the [City].")  Any given factual allegation can be found scattered endlessly throughout the SAC, such as Leuschner's alleged failure to instruct Green and White on how to safeguard Harvey while he was in the interview room, which appears at least seven times.  (Id. at pp. 49, 52, 58, 71, 85, 94.)  Repeating the same sentiment in slightly different ways only offers clutter and confusion, obfuscating the claim.  See Weinstein v. City of

N. Bay Vill., 977 F. Supp. 2d 1271, 1285 (S.D. Fla. 2013) ("Shotgun pleadings are those which are confusing, incoherent, or *repetitive*.") (emphasis added).

The SAC also has no shortage of conclusory allegations.  (See, e.g., doc. 67, p. 96 ("The above-cited practices, policies, and customs amounted to violations of Mr. William Harvey's constitutional rights that were the moving force and a direct and proximate cause of Mr. Harvey's injuries, death, and damages."); id. at p. 74 ("an undeniable causal connection exists between Defendant Leuschner's role as a supervisor and Mr. Harvey's death as Defendant Leuschner's custom or policy resulted in the deliberate indifference to Mr. Harvey's constitutional rights.").)  The SAC "is guilty of the venial sin of being replete with conclusory . . . facts."  Weiland, 792 F.3d at 1322.  For all the discussed reasons, the SAC is an impermissible shotgun pleading.

Additionally, in their Response, Plaintiffs voluntarily withdraw several of their claims. Specifically, Plaintiffs withdraw their deliberate indifference claims against both White and Kerr (Count II), (id. at p. 14), their supervisory liability and Monell claims againt Minter (Count III), (id. at pp. 17, 22), and their punitive damages claim against Minter (Count VII), (id. at p. 22). Plaintiffs also agree to strike the portion of their SAC related to racial animus.  (Id. at p. 8.)  In light of these concessions, Plaintiffs offer that, "for clarity of the record," they are willing to submit a more definite statement.  (Id. at p. 7.)  By correcting the SAC's deficiencies discussed and omitting the now withdrawn claims, a more definite statement will offer greater clarity and help provide Defendants "adequate notice of the claims against them and the grounds upon which each claim rests."  Weiland, 792 F.3d at 1323.  Thus, the Court **GRANTS** Defendants' Motion for a More Definite Statement and **DIRECTS** Plaintiffs to file a third amended complaint reflecting

only their remaining claims and remedying the shotgun pleading-related infirmities identified by the Court herein.[5]

## II.     Defendants' Partial Motion to Dismiss

Defendants next move to dismiss Counts II and III of Plaintiffs' claims.[6]  (Doc. 70-1, pp. 9–21.)  To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009).  That said, this tenet "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft, 556 U.S. at 678.  Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and

---

[5] For more specific instructions, see this Order's Conclusion Section, infra.

[6] Defendants also move to strike Plaintiffs' allegations related to racial animus.  (Doc. 70-1, p. 9.)  Plaintiffs offer no argument in response and ultimately agreed to strike this portion of the SAC, (doc. 73, p. 8), so Defendants' motion to strike allegations related to racial animus is **GRANTED**, (doc. 70-1, p. 9).

plausibility of entitlement to relief." Ashcroft, 556 U.S. at 678 (internal quotation marks and citation omitted). Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

### A. Plaintiffs' Deliberate Indifference Claims Against Leuschner

Defendants first argue that Leuschner is entitled to qualified immunity on Plaintiffs' deliberate indifference claims (Count II).[7] (Doc. 70-1, pp. 10–13, 15.) Qualified immunity protects government officials performing discretionary functions[8] from suit in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Determining whether qualified immunity is appropriate is a two-step inquiry. First, the Court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002). If a plaintiff plausibly alleges a constitutional violation, the Court then must consider whether the right violated was "clearly established." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002); Saucier v. Katz, 533 U.S. 194, 201 (2001).

---

[7] Defendants likewise argued that Plaintiffs' deliberate indifference claims against Defendant White and Defendant Kerr should be dismissed based on qualified immunity, (doc. 70-1, pp. 14–15), and Plaintiffs, in their Response, voluntarily withdrew their deliberate indifference claims against those Defendants, (doc. 73, p. 14). Accordingly, Defendants' Motion to Dismiss Plaintiffs' deliberate indifference claims against Defendants White and Kerr (Count II) is **GRANTED**. (Doc. 70-1, pp. 14–15.)

[8] There is no dispute over whether Leuschner was acting within her discretionary authority. (Doc. 73, p. 9.)

"[P]retrial detainees . . . plainly have a . . . right to be protected from self-inflicted injuries, including suicide." Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005). The inquiry here is whether Leuschner's actions, as alleged, constitute a constitutional violation.

To establish liability for a prisoner's[9] suicide under 42 U.S.C. § 1983, "the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." Id. (quoting Cagle v. Sutherland, 334 F.3d 980, 986 (11th Cir. 2003)). "The plaintiff must prove that the official had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence."[10] Gish v. Thomas, 516 F.3d 952, 954 (11th Cir. 2008). Specifically, a plaintiff must allege that the defendant deliberately disregarded "a *strong likelihood* rather than a mere possibility that the self-infliction of harm will occur."

---

[9]  In this context, pretrial detainees are entitled to the same protections as prisoners, since states may not impose on pretrial detainees conditions that would violate a convicted prisoner's rights. Hamm v. DeKalb Cnty., 774 F.2d 1567, 1573–74 (11th Cir. 1985).

[10]  The Court notes that the standard for deliberate indifference is somewhat unclear in the wake of Wade v. McDade, 67 F.4th 1363 (11th Cir. 2023), *vacated by*, Wade v. Ga. Corr. Health, LLC, 83 F.4th 1332 (11th Cir. 2023). In Wade v. McDade, the Eleventh Circuit explained "for more than 25 years now, our case law regarding a deliberate indifference claim's mens rea element has been hopelessly confused, resulting in what we'll charitably call a 'mess.'" Wade, 67 F.4th at 1371. Before Wade v. McDade, Eleventh Circuit decisions have used two competing formulations of the standard of care in deliberate indifference cases: either "more than mere negligence" or "more than gross negligence." Compare Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) with Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). In Wade v. McDade, the Eleventh Circuit sought to end the confusion and concluded that "more than gross negligence" was the correct standard. Wade, 67 F.4th at 1373. Despite this brief moment of clarity, the Eleventh Circuit in Wade v. Ga. Corr. Health, LLC thereafter granted a rehearing en banc, vacating the previous ruling. 83 F.4th at 1332. As a result, the Eleventh Circuit authority has briefly returned to its somewhat muddled state. Worse yet, the Eleventh Circuit has held that "[t]hese competing articulations— 'gross' vs. 'mere' negligence—may well represent a distinction without a difference because . . . the Supreme Court itself has likened the deliberate-indifference standard to 'subjective recklessness as used in the criminal law.'" Hoffer v. Sec'y, Fla. Dept. of Corr., 973 F.3d at 1270 n.2 (11th Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 839–40 (1994)). That is, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." Farmer, 511 U.S. at 836. Thus, pending a definitive negligence standard for deliberate indifference, it stands to reason that a plaintiff plausibly alleges deliberate indifference so long as he alleges that the defendant recklessly disregarded a strong likelihood of self-harm.

Cook, 402 F.3d at 1115.  "The mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners."  Id. (alterations adopted); see also Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990) ("Absent knowledge of a detainee's suicidal tendencies, . . . failure to prevent suicide has never been held to constitute deliberate indifference.").

"[A] 'strong likelihood' of suicide does not exist . . . unless all of the following factors are present: (1) the inmate previously had threatened or attempted suicide; (2) that prior threat or attempt was known to the defendants; (3) the prior threat or attempt was somewhat recent; and, (4) the prior threat or attempt appeared genuine."  Turner v. Phillips, 547 F. Supp. 3d 1188, 1200 (N.D. Fla. 2021), aff'd, No. 21-12370, 2022 WL 458238 (11th Cir. Feb. 15, 2022) (quoting Greffey v. State of Ala. Dep't of Corr., 996 F. Supp. 1368, 1382 (N.D. Ala. 1998)).

To establish Leuschner's subjective knowledge and disregard of a strong likelihood of self-harm, Plaintiffs point to several facts that were known to her at the time: Harvey suffered from schizophrenia, bipolar disorder, and depression; he had Zoloft and alcohol in his system; he was emotional and crying; he banged his head on the table and appeared to be in shock; he stated, "I'm not going back to jail, you all will have to kill me," and that he would "rather die" than go to jail; and that Leuschner instructed White and Green to check on Harvey if they heard something.  (Doc. 73, pp. 11–12 (citing doc. 67, pp. 72–73).)  Taken together, Plaintiffs argue Leuschner had subjective knowledge that Harvey posed a risk of serious self-harm.  (Id. at p. 13.)

Defendants argue this is insufficient because "the baseline requirement for subjective knowledge in a suicide case is knowledge of a previous threat or attempt at suicide."  (Doc. 70-1, p. 12.)  Defendants are correct that "no matter how [a] defendant['s] actions might be viewed, the law in th[e Eleventh C]ircuit makes clear that they cannot be liable under [Section] 1983 for the

14

suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk." Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994) (internal quotation omitted). Defendants argue that there was not a strong likelihood of suicide, as Harvey was cooperative and indicated that he was not a violent person. (Doc. 70-1, p. 13).

Still, as alleged by Plaintiffs, Harvey stated, "I'm not a violent person but I'll stand on myself and kill myself." (Doc. 67, p. 7.) This is a clear threat of suicide made directly to Leuschner. Using the Turner factors, and drawing natural inferences in Plaintiffs' favor—as the Court must—this amounts to a "strong likelihood" of suicide, because: (1) Harvey threatened to "kill [him]self;" (2) this threat was known to Leuschner, as she was the direct recipient of the statement; (3) the threat was recent, as it happened shortly before the actual suicide; and (4) viewed in conjunction with Harvey's emotional state and physical state, the threat can be reasonably inferred to be genuine. See Turner, 547 F. Supp. 3d at 1200; see also Cole v. Jones, No. 2:21-CV-26-RAH-KFP, 2024 WL 1601210, at *5 (M.D. Ala. Mar. 13, 2024), *report and recommendation adopted,* No. 2:21-CV-26-RAH, 2024 WL 1343114 (M.D. Ala. Mar. 29, 2024) (finding a strong likelihood of suicide where the prisoner told the officer directly that he intended to kill himself and the officer made no effort to protect him from doing so). As alleged, even though Harvey had just threatened to kill himself, Leuschner deliberately left Harvey alone behind a closed door on multiple occasions, failing to instruct anyone else to maintain observation of him. Given the circumstances, this could amount to a reckless disregard of a strong likelihood of self-harm.

Thus, Plaintiffs plausibly alleged that Leuschner was aware of a strong likelihood that Harvey would commit suicide, and, by failing to act, was deliberately indifferent to him taking his own life. See Greason v. Kemp, 891 F.2d 829, 835–836 (11th Cir. 1990) ("Where prison personnel directly responsible for inmate care have knowledge that an inmate . . . threatened[] suicide, their

failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference.").  Because Plaintiffs alleged a violation of a clearly established constitutional right, qualified immunity is inappropriate, and Defendants' Motion to Dismiss Plaintiffs' deliberate indifference claims against Leuschner (Count II) is **DENIED**.  (Doc. 70-1, pp. 10–13.)

B.      **Plaintiffs' Supervisory Liability Claims Against Leuschner and Kerr**

Defendants next move to dismiss Plaintiffs' supervisory liability claims against Leuschner and Kerr (Count III) based on qualified immunity.[11]  (Doc. 70-1, pp. 15–18.)  In general, Section 1983 liability must be based on something more than a defendant's supervisory position or a theory of respondeat superior.  Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009); Braddy v. Fla. Dep't of Lab. & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998).  A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations.  Braddy, 133 F.3d at 802. That is, "[i]n order to establish that a defendant committed a constitutional violation in his supervisory capacity, a plaintiff must show that the defendant instituted a custom or policy that results in deliberate indifference to constitutional rights."  Goebert v. Lee County, 510 F.3d 1312, 1331 (11th Cir. 2007) (internal quotations omitted).

"[A] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  Id. at 1332.  "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law."  Id.  (citing City of St. Louis v. Praprotnik, 485 U.S. 112,

---

[11]  For the same reasons, Defendants likewise move to dismiss the supervisory liability claims against Minter, (doc. 70-1, pp. 16–17), which Plaintiffs, in their Response, voluntarily withdrew, (doc. 73, p. 17). Accordingly, Defendants' Motion to Dismiss Plaintiffs' supervisory liability claims against Minter (Count III) is **GRANTED**.

127 (1988)).  Importantly, demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice."  Depew v. City of St. Mary's, 787 F.2d 1496, 1499 (11th Cir. 1986).  "The standard by which a supervisor can be held liable for the actions of a subordinate is extremely rigorous."  Piazza v. Jefferson Cnty., 923 F.3d 947, 957 (11th Cir. 2019) (internal quotations omitted).

### (1)   Kerr's Supervisory Liability

Plaintiffs seek to hold Kerr liable for his "fail[ure] to adequately supervise" Leuschner, White, and Greene.  (Doc. 73, p. 21; doc 67, p. 84.)  In support, Plaintiffs point to: Kerr's failure to remain on the scene to assist Leuschner and exercise authority over Harvey's detention; his failure to place White or Greene in the interview room despite knowing that Leuschner was leaving; and his failure to determine whether Leuschner had activated the video surveillance system.  (Id.)

Plaintiffs fail to allege a relevant policy or custom for the purposes of supervisory liability.[12]  "[T]o prove that a policy or its absence caused a constitutional harm, a plaintiff must point to multiple incidents."  Piazza, 923 F.3d at 957; see also Craig v. Floyd County, 643 F.3d 1306, 1312 (11th Cir. 2011) ("A single incident of a constitutional violation is insufficient to prove a policy or custom."); Christmas, 51 F.4th at 1355 ("isolated occurrences" cannot establish widespread constitutional violations).  As Defendants point out, Plaintiffs' SAC is devoid of any other allegations of similar scenarios.  (Doc. 70-1, p. 17; see generally doc. 67.)  Plaintiffs have, at best, alleged that Kerr failed to follow SPD policies on the day of the incident.  Even so, this is

---

[12] Plaintiffs vaguely argue that "Kerr's custom or policy resulted in deliberate indifference" to Harvey's rights because Kerr "assumed . . . Leuschner would have complied with [the relevant policies] relating to direct visual observation of . . . Harvey [and] the actuation of the video surveillance system."  (Doc. 73, p. 22; doc. 67, p. 77.)  The Court is unsure what this means, and aside from this unclear reference to some policy concerning visual observation, Plaintiffs do not allege that Kerr initiated some unconstitutional policy.

insufficient to show supervisory liability because a single incident cannot establish liability.  See Goebert, 510 F.3d at 1332 (finding plaintiff failed to meet "'extremely rigorous' standard for supervisory liability" when plaintiff failed to show any other inmate was exposed to policy or custom violating their rights); Est. of Tilson v. Rockdale Cnty., Georgia, No. 1:19-CV-01353-JPB, 2021 WL 913937, at *6 (N.D. Ga. Mar. 10, 2021) (holding plaintiffs failed to state a claim for supervisory liability where they alleged only one instance in which jail employees acted unconstitutionally); Wilson v. Mack, No. CV 1:23-00207-KD-N, 2024 WL 973977, at *4 (S.D. Ala. Feb. 15, 2024), *report and recommendation adopted*, No. CV 1:23-00207-KD-N, 2024 WL 969693 , at *4 (S.D. Ala. Mar. 6, 2024) ("[E]ven if [p]laintiff could identify the relevant policy, . . . he cannot point to the multiple incidents necessary to establish the requisite causal connection." ).   Because Plaintiffs have failed to allege that Kerr implemented or followed some unconstitutional custom or policy, Plaintiffs have failed to allege a basis for establishing supervisory liability.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' supervisor liability claim against Kerr (Count III) is **GRANTED**.  (Doc. 70-1, pp. 15–17.)

### (2)    Leuschner's Supervisory Liability

Defendants also move to dismiss Plaintiffs' supervisory claim against Leuschner (Count III).  (Doc. 70-1, pp. 15–16, 18.)  Plaintiffs allege it was Leuschner's custom to disregard the SPD video surveillance policy.  (Doc. 67, pp. 49–50.)  This is insufficient to state a claim for supervisory liability.  Construing the SAC in the light most favorable to Plaintiffs, they allege, at best, recurring violations of SPD policies, yet they fail to allege how those violations amounted to widespread constitutional violations.  "The law is settled . . . that a violation of departmental rules or policies, standing alone, does not infringe upon an inmate's constitutional rights."  Sullen v. Dunn, No. 2:17-CV-198-RAH-WC, 2020 WL 2311672, at *4 (M.D. Ala. Apr. 1, 2020), *report and*

*recommendation adopted*, No. 2:17-CV-198-RAH, 2020 WL 2312032 (M.D. Ala. May 8, 2020); see also Taylor v. Adams, 221 F.3d 1254, 1259 (11th Cir. 2000) ("[F]ailure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence."); Sandin v. Conner, 515 U.S. 472, 481–82 (1995) (holding prison regulations are not intended to confer rights or benefits on inmates but are merely designed to guide correctional officials in the administration of prisons); United States v. Caceres, 440 U.S. 741, 751–52 (1979) (holding mere violations of agency regulations do not raise constitutional questions); Fischer v. Ellegood, 238 F. App'x 428, 431 (11th Cir. 2007) (finding plaintiff's claim alleging defendants violated an internal jail policy was insufficient to survive summary judgment); Magluta v. Samples, 375 F.3d 1269, 1279 n.7 (11th Cir. 2004) (noting that "procedural requirements set out in [an administrative] regulation are not themselves constitutional mandates."). Again, without alleging multiple instances of *constitutional* violations, Plaintiffs have failed to allege a claim for supervisory liability. See Piazza, 923 F.3d at 957. Accordingly, Defendants' Motion to Dismiss Plaintiffs' supervisor liability claim against Leuschner (Count III) is **GRANTED**.[13] (Doc. 70-1, pp. 15–17.)

### C.    Plaintiffs' Claims for Punitive Damages and Attorneys' Fees Against Kerr

Lastly, Defendants move to dismiss Plaintiffs' claims against Kerr for punitive damages and attorneys' fees (Counts VII and VIII, respectively). Defendants argue that these are derivative claims that cannot survive where Plaintiffs' substantive claim against Kerr is dismissed.[14] (Doc.

---

[13] In Count III of Plaintiffs' SAC, Plaintiffs also asserted a Monell liability claim against Minter. (Doc. 67, p. 64.) However, as stated Discussion Section I, supra, in their Response, Plaintiffs voluntarily withdrew this claim. (Doc. 73, p. 22.) With the dismissal of Plaintiffs' supervisory liability claims and the withdrawal of Plaintiffs' Monell liability claim, Defendants' Motion to Dismiss Count III of Plaintiffs' Complaint is **GRANTED** in full. (Doc. 70-1, pp. 15–20.)

[14] Defendants likewise moved to dismiss Plaintiffs' claims for punitive damages and attorneys' fees against Minter, (doc. 70-1, p. 20), and Plaintiffs, in their Response, voluntarily withdrew these claims against

70-1, p. 20.)  This is correct.  "A punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required."  <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1304 (11th Cir. 2009).  Additionally, to recover attorneys' fees in a Section 1983 action, a plaintiff must be a "prevailing party."  42 U.S.C. § 1988(b); <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983). Accordingly, because the Court has found that Plaintiffs have failed to plead facts to support a supervisory liability claim against Kerr, <u>see</u> Discussion Section II.B(1), <u>supra</u>, and because no other substantive count against Kerr remains, Defendants' Motion to Dismiss Plaintiffs' claims for punitive damages and attorneys' fees (Counts VII–VIII) is **GRANTED**.  (Doc. 70-1, p. 20.)

## CONCLUSION

For the reasons above, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for More Definite Statement and Partial Motion to Dismiss.  (Doc. 70.)  Plaintiffs have not alleged that Kerr or Leuschner were acting pursuant to an unconstitutional policy or custom necessary to establish supervisory liability under Section 1983, and accordingly the Court **GRANTS** Defendants' Motion with respect to those claims (Count III).  Additionally, Plaintiffs voluntarily withdrew their deliberate indifference claims against both White and Kerr (Count II), their supervisory liability and <u>Monell</u> claims against Minter (Count III), and their punitive damages claim against Minter (Count VII), and the Court therefore **GRANTS** the Motion with respect to those claims.  The Court, however, **DENIES** Defendants' Motion to Dismiss Plaintiffs' deliberate indifference claim against Leuschner, because Plaintiffs have plausibly alleged that Leuschner disregarded the substantial risk of Harvey's suicide (Count II).

---

Minter, (doc. 73, p. 22.)  Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims for punitive damages and attorneys' fees against Minter (Counts VII–VIII) is **GRANTED**.  (Doc. 70-1, p. 20.)

Because no claims remain against Kerr and Minter, the Court **DISMISSES** Defendants Kerr and Minter from this action and **DIRECTS** the Clerk of Court to **UPDATE** the docket accordingly.

Additionally, because the SAC amounts to a shotgun pleading, and further considering the number of now-dismissed claims, the Court **GRANTS** Defendants' Motion for More Definite Statement and **ORDERS** Plaintiffs to file an amended complaint (to be titled "Third Amended Complaint"). In it, Plaintiffs shall clearly assert their remaining claims, specifying which allegations apply to which Defendant(s). The Third Amended Complaint shall omit allegations relevant only to dismissed or withdrawn claims. The Third Amended Complaint shall contain only the factual allegations needed to state Plaintiffs' remaining claims and avoid the use of repetitive, irrelevant, or conclusory factual allegations. Plaintiffs **SHALL NOT** make any additions, modifications, or other amendments to their SAC other than those explicitly ordered here.

The Third Amended Complaint must be filed **within fourteen (14) days** of this Order. Once Plaintiffs file the Third Amended Complaint, Defendants will have **twenty-one (21) days** to answer or to file, if they so choose, a renewed motion to dismiss. Should Defendants choose to file a motion, Plaintiffs will have **fourteen (14) days** to file a response. If they file a response, Defendants will have **fourteen (14) days** to file a reply. Plaintiffs are advised that the failure to timely file a Third Amended Complaint that comports with the instructions outlined here may result in the dismissal of this case.

**SO ORDERED**, this 13th day of June, 2024.

_____
R. STAN BAKER, CHIEF JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA